Emily ADLER, individually;  on behalf of herself and all persons similarly situated, Seth Finck, individually;  on behalf of himself and all persons similarly situated, et al., Plaintiffs-Appellants,

v.

DUVAL COUNTY SCHOOL BOARD, Duval County Public School District, Defendants-Appellees.

Emily Adler, individually;  on behalf of herself and all persons similarly situated, Seth Finck, individually;  on behalf of himself and all persons similarly situated, et al., Plaintiffs-Appellees,

v.

Susan Boles, as parent & next friend of Rebecca Boles, a minor child and on behalf of all public school students within the Duval County Public School District, Movants-Appellants.

Nos. 98-2709, 98-2720.

United States Court of Appeals,

Eleventh Circuit.

March 15, 2000.

Appeals from the United States District Court for the Middle District of Florida. (No. 98-00460-CV-J-10C), Wm. Terrell Hodges, Judge.

Before ANDERSON, Chief Judge, TJOFLAT, EDMONDSON, COX, BIRCH, DUBINA, CARNES, BARKETT, HULL, MARCUS and WILSON, Circuit Judges,[*] and KRAVITCH, Senior Circuit Judge.[**]

MARCUS, Circuit Judge:

At issue today is whether the Duval County, Florida school system's policy of permitting graduating students to vote on whether to select a student to deliver a message wholly of her own choosing at the beginning or closing of a high school graduation ceremony violates the Establishment Clause.  Because the Duval County policy unambiguously recognizes the "crucial difference between *government* speech endorsing religion, which the Establishment Clause forbids, and *private* speech [ ] [that may contain a prayerful message], which the Free Speech and Free Exercise Clauses protect," *Board of Educ. v. Mergens,* 496 U.S. 226, 250, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990) (emphasis added), we find the policy

---

[*]Judge Susan H. Black did not participate in this decision.

[**]Senior U.S. Circuit Judge Phyllis A. Kravitch elected to participate in this decision pursuant to 28 U.S.C. § 46(c).

constitutional on its face and affirm the judgment of the district court. The total absence of state involvement in deciding whether there will be a graduation message, who will speak, or what the speaker may say combined with the student speaker's complete autonomy over the content of the message convinces us that the message delivered, be it secular or sectarian or both, is not state-sponsored. To conclude otherwise would come perilously close to announcing an absolute rule that would excise *all* private religious expression from a public graduation ceremony, no matter how neutral the process of selecting the speaker may be, nor how autonomous the speaker may be in crafting her message.

I.

The facts of this case are straightforward, uncontroverted, and laid out fully by the district court in *Adler v. Duval County Sch. Bd.,* 851 F.Supp. 446, 448 (M.D.Fla.1994) ("*Adler I* "). Invocations, benedictions, and other religious prayers or messages were traditionally offered, by clergy and others, at public high school commencement ceremonies in the Duval County School District. In 1992, the Supreme Court in *Lee v. Weisman,* 505 U.S. 577, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992), held that a Providence, Rhode Island high school principal, acting in accord with school board policy, violated the Establishment Clause by inviting a local clergyman to deliver a nonsectarian prayer at graduation. In response to *Lee,* the Duval County Superintendent, Larry Zenke, at the behest of Vicki R. Reynolds, the school district's legal affairs officer, issued a memorandum instructing all school officials in the Duval County school system that no "prayer, benediction, or invocation" should be offered at "any graduation ceremonies."[1]

In the ensuing months, Superintendent Zenke received a number of letters from students and members of the community discussing the graduation policy. Some of these letters suggested that student-initiated, student-led prayer might be constitutional under *Lee,* and Zenke directed Reynolds to further research the issue. Reynolds later advised Zenke that it would be constitutional to allow student-initiated, student-led

---

[1]The memorandum, dated July 22, 1992, read, "[t]his memorandum is to remind you that due to the recent Supreme Court Ruling in Lee v. Weisman, there should be no prayer, benediction, or invocation at any graduation ceremonies."

prayer during the graduation ceremony so long as the administration and faculty were not involved in the decision-making process. Zenke then authorized Reynolds to issue another memorandum (the "Reynolds Memorandum"), dated May 5, 1993, to all area high school principals. The memorandum was entitled "Graduation Prayers" and stated:

> You will recall that after the 1992 Supreme court case of Lee v. Wiseman [sic], you received a memorandum from me instructing that because of the decision, we would no longer be able to have prayers at graduation ceremonies. Most of you have recently been bombarded with information, as have I, regarding whether or not student initiated and led prayers are acceptable based upon a recent Fifth Circuit opinion. The purpose of this memorandum is to give you some guidelines on this issue if the graduating students at your school desire to have some type of brief opening and/or closing message by a student.
>
> This area of the law is far from clear at this time, and we have been threatened by lawsuits from both sides on the issue depending on what action we take. The key to the Lee v. Wiseman [sic] decision was that the prayer given at that graduation ceremony was directed and initiated by the school system, which made it unconstitutional, rather than by permissive student choice and initiative. With that premise in mind, the following guidelines may be of some assistance:
>
> 1. The use of a brief opening and/or closing message, not to exceed two minutes, at high school graduation exercises shall rest within the discretion of the graduating senior class;
>
> 2. The opening and/or closing message shall be given by a student volunteer, in the graduating senior class, chosen by the graduating senior class as a whole;
>
> 3. If the graduating senior class chooses to use an opening and/or closing message, the content of that message shall be prepared by the student volunteer and shall not be monitored or otherwise reviewed by Duval County School Board [sic], its officers or employees;
>
> The purpose of these guidelines is to allow students to direct their own graduation message without monitoring or review by school officials.

This policy never was directly voted on or debated by the School Board.

Instead, at a June 1, 1993 School Board meeting, a motion was made to substitute a "moment of silence" for any student-initiated messages that might otherwise be given pursuant to the graduation policy announced in the Reynolds Memorandum. The motion failed by a vote of four to three. As a result, the Reynolds Memorandum was "left in force with the acquiescence or tacit approval of the Board as its official policy governing the 1993 commencement exercises." *Adler I,* 851 F.Supp. at 449. In 1993 under this policy, student speakers, at ten of seventeen high school graduation ceremonies, delivered some form of religious

3

message. Notably, at the other seven graduations, there were no student messages at all or the messages were entirely secular in character. There is no tabulation in the record of comparable statistics for subsequent graduations.

In June 1993, various Duval County public school students sued the Duval County school system, alleging that the policy embodied in the Reynolds Memorandum constituted an establishment of religion and infringed on their free exercise of religion. These students sought equitable relief declaring the policy unconstitutional and enjoining the Duval County School Board from permitting prayers at high school graduation ceremonies as well as money damages. The students also sought to certify their action as a class action.[2] The district court denied the motion to certify the class and granted summary judgment in favor of the Duval County school system, holding that its policy was constitutional. *See Adler I,* 851 F.Supp. at 451-56. The students appealed, and a panel of this court found that because the students had all graduated, their claims for declaratory and injunctive relief were moot. *See Adler v. Duval County Sch. Bd.,* 112 F.3d 1475, 1477-78 (11th Cir.1997) [hereinafter *Adler II* ]. The *Adler II* court also held that the students waived their damages claims on appeal. *See Adler II,* 112 F.3d at 1480-81. The Reynolds Memorandum thus remained the operative high school graduation policy for Duval County.

In May 1998, Appellants brought the instant action against the Duval County school system, again alleging that the policy embodied in the Reynolds Memorandum constituted an establishment of religion and infringed on their free exercise of religion. Appellants sought preliminary and permanent injunctive relief against the Duval County School Board to prevent it from permitting, conducting, or sponsoring any religious exercises or prayer and instruction within the Duval County Public School District, including at School Board-sponsored graduation ceremonies. Appellants also sought monetary damages and class certification.[3]

---

[2]These "original" plaintiffs consisted of the following students: Leslie Adler, Laura Jaffa, and Robin Zion. Doug Rand later joined the action. Karen Adler and Robin Rand, the mothers of Leslie Adler and Doug Rand, were named as plaintiffs to bring the claims of their minor children.

[3]Appellants in the instant action include: Emily Adler, a June 1998 graduate of Mandarin High School; Seth Finck, a June 1998 graduate of Stanton College Preparatory School; Stella Finck, mother of Duval

The district court, at the hearing on Appellants' motion for a preliminary injunction and with the consent of the parties, consolidated the merits of Appellants' claims with Appellants' preliminary injunction motion pursuant to Federal Rule of Civil Procedure 65(a)(2). The district court then denied Appellants' motion for preliminary injunction and entered final judgment in favor of the Duval County School Board.

Appellants filed a motion for expedited appeal and a panel of this Court heard oral argument on November 16, 1998. The panel reversed the district court's judgment and remanded for further proceedings. On June 3, 1999, we vacated this opinion and granted rehearing en banc.

II.

The central issue presented is whether the Duval County school system's policy of permitting a graduating student, elected by her class, to deliver an unrestricted message of her choice at the beginning and/or closing of graduation ceremonies is facially violative of the Establishment Clause.[4] Close attention

---

County public school students Rachel Finck, who was scheduled to graduate from Stanton College Preparatory School in 1999, Aaron Finck, who was scheduled to graduate from Stanton College Preparatory School in 2000, and Benjamin Finck, a Duval County public school student; Roberta Nord, mother of Duval County public school students Lucy Nord, age 9, and Tyler Hurley, age 12; and Jonathon Rand, a June 1998 graduate of Stanton College Preparatory School.

[4]We construe this appeal as the appeal of a final judgment strictly pertaining to the facial constitutionality of the Duval County graduation policy. We do not address any potential "as-applied" claims raised below by Appellants. This result is driven by the procedural history of the case. Initially, Appellants sought a preliminary injunction in addition to their facial and as-applied claims on the merits. At the pretrial hearing on the preliminary injunction, the district court indicated that it thought that Appellant's claims on the merits should be consolidated with the preliminary injunction motion because the claims were duplications of earlier claims it had evaluated in *Adler I*. The district court asked whether any operative facts had changed and the parties stipulated that there had been no substantive changes. As the district court explained:

> This is, for all practical purposes, the second time this case has appeared before this court. In 1994 a similar group of Plaintiffs represented by the same counsel sought the same injunctive relief with respect to high school graduation or commencement ceremonies then scheduled to be conducted in the spring of that year. I decided at that time that the Plaintiffs' constitutional rights were not infringed. *This action presents precisely the same claims predicated upon the same constitutional theories or contentions; and, at today's hearing, counsel stipulated that the operative facts remain unchanged.* The only factual difference is that a new series of graduation ceremonies is scheduled for 1998. The present case was filed for the purpose of relitigating the issue upon the contention of Plaintiffs' counsel that the law has now evolved in their favor as manifested by [ ] [several] intervening decisions....

to the operative features of the Duval County policy yields the conclusion that the policy is constitutional on its face. Simply put, the selection of a graduation student speaker by a secular criterion (not controlled by the state) to deliver a message (not restricted in content by the state) does not violate the Establishment Clause merely because an autonomous student speaker *may* choose to deliver a religious message. *See Lee,* 505 U.S. at 630 n. 8, 112 S.Ct. 2649, 120 L.Ed.2d 467 (Souter, J., concurring) (observing that "[i]f the State had chosen its graduation day speakers according to wholly secular criteria, and if one of those speakers (not a state actor) had individually chosen to deliver a religious message, it would have been harder to attribute an endorsement of religion to the State") (citing *Witters v. Washington Dep't of Servs. for the Blind,* 474 U.S. 481, 106 S.Ct. 748, 88 L.Ed.2d 846 (1986)).

Establishment Clause jurisprudence calls for the difficult task of separating a student's *private* message, which may be religious in character, from a state-sponsored religious message, protecting the former

---

*See Adler v. Duval County Sch. Bd.,* No. 98-460-CIV-J-10C (M.D.Fla. May 27, 1998) (internal citation omitted) (emphasis added). The district court then took judicial notice of its opinion in *Adler I* and consolidated the action on the merits with Appellants' motion for preliminary injunction. Finally, the district court distinguished the intervening decisions cited by Appellants and concluded:

> [T]he proper decision in this case is dictated by the decision I reached in *Adler I,* and that the application for preliminary injunctive relief should be denied now as it was then. Furthermore, *as counsel agreed during today's hearing, there is no just reason in fact or law* as to why the action should not be advanced on the merits and consolidated with the hearing of the instant application so that final judgment may be entered and the controversy may proceed to the Court of Appeals.

*Id.* (emphasis added). Both parties consented to the consolidation and Appellants did not object to the effect this consolidation would have on their as-applied claims. Because of the consolidation, discovery was truncated as to the policy's application and effect for graduation ceremonies after 1993 and Appellants' as-applied claims were never fully developed or litigated below. Appellants' consent to the district court's consolidation constituted a knowing waiver of their as-applied claims, circumscribing the action and the district court's final judgment to the facial constitutionality of the graduation policy. *See Warehouse Groceries Management, Inc. v. SAV-U-Warehouse Groceries, Inc.,* 624 F.2d 655, 657-58 (5th Cir.1980) (noting that district court, pursuant to Federal Rule of Civil Procedure 65(a)(2), may properly consolidate the merits of a case with a preliminary injunction hearing so long as parties are given adequate notice); *Fenstermacher v. Philadelphia Nat'l Bank,* 493 F.2d 333, 337 (3rd Cir.1974) (noting that party's failure to object to district court's consolidation of the merits with a preliminary injunction hearing constituted a waiver of any defects stemming from the consolidation because the party had "acquiesced in the procedure followed in the district court"). We therefore restrict our review today to the facial constitutionality of the graduation policy.

6

and prohibiting the latter. This determination is of "necessity one of line-drawing," *see Lee,* 505 U.S. at 598, 112 S.Ct. 2649, 120 L.Ed.2d 467, "sometimes quite fine, based on the particular facts of each case,' " *Rosenberger v. Rector and Visitors of the Univ. of Va.,* 515 U.S. 819, 847, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995) (O'Connor, J., concurring). Indeed, our courts have recognized that "at graduation time and throughout the course of the education process, there will be instances when religious values, religious practices, and religious persons will have some interaction with the public schools and their students." *See Lee,* 505 U.S. at 598-99, 112 S.Ct. 2649, 120 L.Ed.2d 467 (citing *Board of Educ. v. Mergens,* 496 U.S. 226, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990)). But at the core of Establishment Clause jurisprudence is the notion that the state may not favor, endorse, or oppose the propagation of religious doctrine by its citizens. In this case, the absence of state involvement in each of the central decisions—whether a graduation message will be delivered, who may speak, and what the content of the speech may be—insulates the School Board's policy from constitutional infirmity on its face.

We measure the facial constitutionality of the policy against both the standards enunciated by the Supreme Court in *Lee,* 505 U.S. 577, 112 S.Ct. 2649, 120 L.Ed.2d 467, the Court's only occasion to directly examine the issue of school prayer at a public high school graduation, and the more general Establishment Clause test articulated in *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971).[5]

A.

---

[5]While the *Lemon* test has drawn considerable criticism from both Members of the Court and legal commentators, *see, e.g., Board of Educ. v. Grumet,* 512 U.S. 687, 721, 114 S.Ct. 2481, 129 L.Ed.2d 546 (1994) (O'Connor, J., concurring) (noting that "the slide away from *Lemon* 's unitary approach is well under way"); Kent Greenawalt, *Quo Vadis: The Status and Prospects of "Tests" Under the Religion Clauses,* 1995 Sup.Ct. Rev. 323, 361 (1996) (declaring that "now that Lemon lacks any defenders on the Court, other judges would perform a shallow exercise were they to continue to apply its terms. They should recognize that the Supreme Court has definitely abandoned Lemon."), it is still binding precedent, *see Lamb's Chapel v. Center Moriches Union Free Sch. Dist.,* 508 U.S. 384, 395 n. 7, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993) (stating that "we return to the reality that there is a proper way to inter an established decision and *Lemon,* however frightening it might be to some, has not been overruled"); *see also Chabad-Lubavitch of Georgia v. Miller,* 5 F.3d 1383, 1388 (11th Cir.1993) (en banc) (explaining that "[a]lthough [the *Lemon* test] has been criticized severely, it still controls our Establishment Clause inquiry"); *Bown v. Gwinnett County Sch. Dist.,* 112 F.3d 1464, 1468-74 (11th Cir.1997) (applying *Lemon* ).

In *Lee,* the Supreme Court scrutinized the Providence, Rhode Island public school system policy of permitting middle and high school principals to invite clerics to offer invocation and benediction prayers at formal high school graduation ceremonies. *See Lee,* 505 U.S. at 580, 112 S.Ct. 2649, 120 L.Ed.2d 467. In particular, the Court considered the 1989 graduation at Nathan Bishop Middle School where the principal invited a local rabbi to offer a religious invocation and benediction at the school's graduation ceremony. The principal also provided the rabbi with a pamphlet entitled "Guidelines for Civic Occasions," prepared by the National Conference of Christians and Jews, and advised the rabbi that the prayer should be nonsectarian. *See id.* at 581, 112 S.Ct. 2649, 120 L.Ed.2d 467.

In declaring the school system policy unconstitutional under the Establishment Clause, the Supreme Court pointed at two "dominant facts" as marking the boundaries of its decision: first, the Providence school officials ordained and directed the performance of a *religious* exercise by deciding to include prayer in the graduation ceremony, by selecting a clergyman to deliver the prayer, and by providing the clergyman with guidelines informing the content of the prayer; and second, pressure was exerted on students to attend graduation and conform with their peers by either standing as a group or remaining in respectful silence during the invocation and benediction. *Id.* at 586-88, 112 S.Ct. 2649, 120 L.Ed.2d 467. What the Supreme Court found striking and troubling about *Lee* was that the government clearly directed a formal religious exercise—albeit in the form of a nonsectarian prayer—under such circumstances as to oblige the participation of many who objected. As Justice Kennedy wrote for the majority:

> These dominant facts mark and control the confines of our decision: State officials direct the performance of a formal religious exercise at promotional and graduation ceremonies for secondary schools. Even for those students who object to the religious exercise, their attendance and participation in the state-sponsored religious activity are in a fair and real sense obligatory, though the school district does not require attendance as a condition for receipt of the diploma.

*Id.* at 586, 112 S.Ct. 2649, 120 L.Ed.2d 467. There can be little doubt, then, that in *Lee,* the Providence, Rhode Island school system ordained and established a religious exercise at a graduation ceremony, and that the graduation prayer delivered by a rabbi was in every sense endorsed and supported by the state.

8

In striking contrast, under the Duval County graduation policy, however, neither the School Board nor its principals may ordain, direct, establish, or endorse a religious prayer or message of any kind. Indeed, by the very terms of the policy, a religious message may not even be offered at graduation. The Duval County policy explicitly divorces school officials from the decision-making process as to whether *any* message—be it religious or not—may be delivered at graduation at all. Moreover, decisional control over the most crucial elements of the graduation policy rests with the students and not the state. According to the policy, school officials merely allow a graduating class to decide by an election whether to have a "brief opening and/or closing message" at graduation. If the class votes to have a message, it elects a student volunteer to deliver the message. That student is then free to deliver a message "not monitored or otherwise reviewed" in any way by the school. Under the policy, the School Board and its agents have no control over who will draft the message (if there be any message at all) or what its content may be. The School Board also does not suggest in any way, let alone require, that the graduating class consider religious or any other criteria in deciding whether to have a student message or in selecting a particular student speaker. And most notably, if the graduating class chooses to have a message, the content of the message shall be prepared by the student speaker alone and no one else. The Duval County School Board is expressly prohibited by the very terms of its policy from influencing or editing the message in any way.

These operational features distinguish the Duval County policy from approximating even an arguably similar level of state control to the graduation policy struck down in *Lee.* Unlike the Providence policy in *Lee,* the Duval County policy, in no way, authorizes a school to "direct the performance of a formal religious exercise." *Lee,* 505 U.S. at 586, 112 S.Ct. 2649, 120 L.Ed.2d 467. And unlike a direct student plebiscite on graduation prayer, not even the senior class exercises control over the content of the graduation message. That decision rests solely with the elected student speaker—with neither the senior class nor the school exercising any sort of editorial oversight. Therefore, on the face of the policy itself, the students unambiguously understand that any student message is utterly divorced from any state sponsorship.

9

*Lee* does not stand for the proposition that all religious expression, even the private religious expression of an elected student speaker, must be excised from public high school graduation ceremonies. Rather, *Lee* prohibits the state from ordaining, directing, endorsing, or sponsoring a religious message at such ceremonies but not from adopting neutral secular policies which simply permit the possibility of private religious expression. *See id.,* 505 U.S. at 589, 112 S.Ct. 2649, 120 L.Ed.2d 467 (observing that "[t]he First Amendment's Religion Clauses mean that religious beliefs and religious expression are too precious to be either proscribed or prescribed by the State"); *id.* at 604-05, 112 S.Ct. 2649, 120 L.Ed.2d 467 (Blackmun, concurring) (explaining that "[t]he Establishment Clause proscribes public schools from 'conveying or attempting to convey a message that religion or a particular religious belief is favored or preferred' ") (quoting *County of Allegheny v. Greater Pittsburgh ACLU,* 492 U.S. 573, 593, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989)); *see also Agostini v. Felton,* 521 U.S. 203, 231, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997) (noting that there is no advancement of religion where "aid is allocated on the basis of neutral, secular criteria that neither favor nor disfavor religion, and is made available to both religious and secular beneficiaries on a nondiscriminatory basis"); *Rosenberger,* 515 U.S. at 839, 115 S.Ct. 2510, 132 L.Ed.2d 700 (stating that "[a] central lesson of our decisions is that a significant factor in upholding governmental programs in the face of Establishment Clause attack is their neutrality towards religion"); *Grumet,* 512 U.S. at 696, 114 S.Ct. 2481, 129 L.Ed.2d 546 (declaring that " '[a] proper respect for both the Free Exercise and the Establishment Clauses compels the State to pursue a course of "neutrality" toward religion' ") (quoting *Committee for Public Educ. & Religious Liberty v. Nyquist,* 413 U.S. 756, 792-93, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973)); *Chandler v. James,* 180 F.3d 1254, 1258-59 (11th Cir.1999) (noting that "ordinarily religious speech by private parties cannot establish religion, even if it occurs in a public institution, such as a school") (citation omitted).

The School Board's policy is perfectly consistent with the theme of neutrality in Establishment Clause jurisprudence. As Justice Souter explained in his concurrence in *Lee:*

> While the Establishment Clause's concept of neutrality is not self-revealing, our recent cases have invested it with specific content: the State may not favor or endorse either religion generally over

10

nonreligion or one religion over others. This principle against favoritism and endorsement has become the foundation of Establishment Clause jurisprudence, ensuring that religious belief is irrelevant to every citizen's standing in the political community....

*Lee,* 505 U.S. at 627, 112 S.Ct. 2649, 120 L.Ed.2d 467 (internal citations omitted). No feature of the Duval County policy favors or endorses religion. The graduation policy is simply content-neutral, and allows an autonomous elected speaker, selected by her class, to deliver a religious or secular message on an equal basis.

In one sense, the policy can be analogized to a line of open forum cases in which the Supreme Court has held that neutral secular policies that merely accommodate religion or individual free exercise rights do not amount to an unconstitutional state endorsement of religion.[6] First, in *Widmar v. Vincent,* 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981), the Court struck down a University of Missouri regulation that denied "equal access" to school facilities for religious groups as a violation of the Free Speech Clause. *Id.* at 274-75, 102 S.Ct. 269, 70 L.Ed.2d 440. In so ruling, the Court explained that an "open forum" policy, which permitted access to both religious and secular student groups in a neutral manner, did not offend the Establishment Clause because "an open forum in a public university does not confer any imprimatur of state approval on religious sects or practices" anymore than such a policy " 'committed [the University] to the goals of the Students for a Democratic Society, the Young Socialist Alliance,' or any other group eligible to use its facilities." *Id.* at 274, 102 S.Ct. 269, 70 L.Ed.2d 440 (citation omitted).

The Supreme Court extended this reasoning to public secondary schools in *Mergens.* There, the Court upheld the constitutionality of the Equal Access Act, 20 U.S.C. § 4071 *et seq.,* which explicitly codified the reasoning of *Widmar* by prohibiting public secondary schools in receipt of federal funds from denying student access to "limited open forum[s]" on the basis of the religious content of their speech. *Mergens,* 496

---

[6]For purposes of our decision, we find it unnecessary to decide whether the Duval County graduation policy creates a "designated public forum"or a "nonpublic forum" as these terms have come to be defined by our public forum caselaw. *See Arkansas Educ. Tele. Comm'n v. Forbes,* 523 U.S. 666, 118 S.Ct. 1633, 1641-43, 140 L.Ed.2d 875 (1998). We rely on public forum doctrine only in so far as it informs Establishment Clause jurisprudence regarding principles of state endorsement and neutral accommodation towards private religious speech.

11

U.S. at 235, 110 S.Ct. 2356, 110 L.Ed.2d 191. The Court elaborated a core tenet of its neutrality jurisprudence in the process:

> [T]here is a crucial difference between government speech endorsing religion, which the Establishment Clause forbids, and private speech endorsing religion, which the Free Speech and Free Exercise Clauses protect. We think that secondary school students are mature enough and are likely to understand that a school does not endorse or support student speech that it merely permits on a nondiscriminatory basis.... Although a school may not itself lead or direct a religious club, a school that permits a student-initiated and student-led religious club to meet after school, just as it permits any other student group to do, does not convey a message of state approval or endorsement of the particular religion.

*Id.* at 250-52, 110 S.Ct. 2356, 110 L.Ed.2d 191. In recent years, the Court has reaffirmed this principle by finding that the inclusion of private religious groups in "open forums" through neutral selection principles does not violate the Establishment Clause or constitute a state endorsement of religion. *See Capitol Square Review & Advisory Bd. v. Pinette,* 515 U.S. 753, 763, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995) (plurality opinion) (concluding that the allowance of a private religious display in an open public forum, selected by the same application process and on the same terms as other private displays, did not amount to state endorsement); *Rosenberger,* 515 U.S. at 832, 115 S.Ct. 2510, 132 L.Ed.2d 700 (holding that a public university subsidy for a religious student organization's publication costs, under a program that funded other student organization publications through neutral selection criteria, did not violate the Establishment Clause); *Lamb's Chapel,* 508 U.S. at 395, 113 S.Ct. 2141, 124 L.Ed.2d 352 (finding that a policy, which allowed private student religious groups equal after-school access to school property through neutral secular criteria, would not violate the Establishment Clause).

These cases strongly suggest that a policy, like the Duval County graduation policy, which provides an opportunity for student-selected, student-initiated private expression through a neutral selection criterion, does not violate the Establishment Clause simply because the venue is equally available for religious or secular expression. Government neutrality towards religion is all that is required by the Establishment Clause. And it is worth emphasizing that while the state must be neutral and cannot advance or endorse religion, similarly, it need not, indeed it cannot, act in a hostile manner in the face of private religious speech

12

publically uttered. *See Lee,* 505 U.S. at 598, 112 S.Ct. 2649, 120 L.Ed.2d 467 (observing that "[a] relentless and all-pervasive attempt to exclude religion from every aspect of public life could itself become inconsistent with the Constitution") (citation omitted); *Zorach v. Clauson,* 343 U.S. 306, 314, 72 S.Ct. 679, 96 L.Ed. 954 (1952) (stating that "we find no constitutional requirement which makes it necessary for government to be hostile to religion and to throw its weight against efforts to widen the effective scope of religious influence").

In essence, this case is substantially like *Doe v. Madison Sch. Dist. No. 321,* 147 F.3d 832 (9th Cir.1998), *vacated on other grounds,* 177 F.3d 789 (9th Cir.1999) (en banc) (vacating for mootness because the student plaintiffs already had graduated). In *Doe,* the Ninth Circuit examined a graduation policy which mirrors Duval County's policy in its neutrality. The *Doe* policy allowed for a minimum of four student graduation speakers to be selected according to their academic standing. If a student accepted the speaking invitation, she could choose to deliver an "address, poem, reading, song, musical presentation, prayer, or any other pronouncement"—the content, of which, she alone controlled. *Doe,* 147 F.3d at 835. The *Doe* court upheld the constitutionality of the policy against a facial challenge on Establishment Clause grounds and distinguished *Lee.* It explained that graduation speech does not bear the imprimatur of the state when the speaker is a student, not a cleric; the student speaker is selected on neutral and secular criteria; and the student has complete autonomy over content. *Doe,* 147 F.3d at 835-36.[7]

---

[7]The other federal circuit cases that have considered student-led, student-initiated prayer at graduation are of limited assistance. All of these cases involve direct student plebiscites on graduation prayer. Of these cases, *Jones v. Clear Creek Indep. Sch. Dist.,* 977 F.2d 963 (5th Cir.1992), is the only one which has permitted students to vote directly on whether to have prayer at graduation. In *Jones,* the Fifth Circuit upheld the Clear Creek, Texas school district's policy allowing graduating students to vote whether student volunteers would deliver "nonsectarian and nonproselytizing" invocations at graduation. The court found: that the Clear Creek policy (1) reserved to the students the decision whether to have an invocation, (2) precluded anyone but a student volunteer from delivering an invocation, and (3) placed less psychological coercion on the student audience than the prayers given in *Lee* because students were aware that any prayers given represented the will of their peers. *See id.* at 970-71.

Both the Third and Ninth Circuits have come to an opposite conclusion. In *ACLU of New Jersey v. Black Horse Pike Regional Bd. of Educ.,* 84 F.3d 1471 (3d Cir.1996) (en banc), the Third Circuit, sitting *en banc,* held as unconstitutional a school board's policy that permitted the senior class to vote on whether to include a prayer at high school graduation ceremonies. *See id.* at 1477-88. The policy in *Black Horse Pike* allowed senior class officers to conduct a poll of the graduating class to

13

Appellants, however, advance two arguments for why we should regard a student-selected graduation speaker, who is selected through a wholly neutral process and who is given complete autonomy over the content of her speech, as a public, state-sponsored speaker. First, they contend that by providing the platform and opportunity, the state has created a sufficient link to the student speaker to convert the student's private speech into public, state-sponsored speech. Second, they suggest that the majoritarian process of selecting the speaker shrouds the otherwise private speech of a student with the imprint of the state. The first argument—that by providing the platform, the speech becomes public—goes too far. The second

---

determine, by plurality vote, whether seniors wanted " 'prayer, a moment of reflection, or nothing at all' " to be included in their graduation ceremony. *Id.* at 1475 (citation omitted). In *Harris v. Joint Sch. Dist. No. 241,* 41 F.3d 447 (9th Cir.1994), *vacated as moot,* 515 U.S. 1154, 115 S.Ct. 2604, 132 L.Ed.2d 849 (1995), high school students themselves, pursuant to a school district policy, planned every aspect of their graduation, without interference from school officials, and voted by written ballot on whether or not to have prayer. The *Harris* court found that the state involvement in the case was pervasive enough to offend Establishment Clause concerns, noting that "[t]he message of the speakers is [ ] chosen by the majority; the relevant speakers are instructed to pray." *Id.* at 456-57.

In contrast to each of these policies, Duval County students vote on whether to have a message of unspecified content delivered by a student. This is a meaningful distinction.

The Fifth Circuit recently revisited the issue of student-initiated prayer in *Doe v. Santa Fe Indep. Sch. Dist.,* 168 F.3d 806 (5th Cir.), *cert. granted in part,* --- U.S. ----, 120 S.Ct. 494, 145 L.Ed.2d 381 (1999). There, the Fifth Circuit examined what it considered to be the holding of *Jones*—"that student-selected, student-given, nonsectarian, nonproselytizing invocations and benedictions at high school graduation ceremonies" are constitutional—and concluded that the constitutionality of a student-selected, student-led prayer policy depends on its "nonsectarian and nonproselytizing" features. *Id.* at 816-19. The *Santa Fe* court also struck down a school policy which allowed student-led, student-initiated prayer before high school football games. The Supreme Court recently has granted certiorari in *Santa Fe.* However, the Court has limited its review to whether student-led, student initiated prayer at football games violates the Establishment Clause. The Court did not grant certiorari on the constitutionality of the *Santa Fe* graduation policy. Appellants cite *Santa Fe* for the proposition that a policy which "permits" sectarian and proselytizing prayers is facially unconstitutional. As discussed in greater detail *infra,* this argument proves too much and is offensive to the Constitution. The Duval County policy, of course, permits sectarian and proselytizing prayers because it places *no* limitations, either secular or sectarian, on the content of a graduation message. A policy of free expression is far more consonant with the commands of the First Amendment than is a policy of censorship. *See, e.g., Mergens,* 496 U.S. at 253, 110 S.Ct. 2356 (stating that "a denial of equal access to religious speech might well create greater entanglement problems in the form of invasive monitoring to prevent religious speech at meetings at which such speech might occur"); *Santa Fe,* 168 F.3d at 829-35 (Jolly, J., dissenting).

14

argument—that the speaker somehow garners state authority by virtue of the plebiscite—has no logical rationale.

First, we reject the notion that the religious content of *any* speech at a graduation ceremony is attributable to the school merely because of the school's sponsorship of the event or its control over the graduation's schedule, timing, decorum, or sequence of events. The Supreme Court did not suggest in *Lee* that school sponsorship of the graduation event, standing alone, was sufficient to find the Providence policy unconstitutional, or it would have banned all religious expression at graduation. If Appellants were right on this point, graduation speakers as diverse as athletes, politicians, academics, entertainers, and maybe even judges would bear the imprimatur of the state because they were handpicked by the school (or, in our case, elected by the senior class) to speak at an event over which the school has great control. Schools then would have to prevent these speakers from discussing a religious topic, engaging in prayer, or imploring the guidance of the Lord, to ensure no Establishment Clause violation and protect themselves from 42 U.S.C. § 1983 liability should an audience member perceive the school to be endorsing the speaker's religious message. Indeed, the same logic would apply to a student graduation speaker selected by other neutral criteria such as academic achievement. But a graduation free of all religious expression, compelled by the school's sponsorship of the event, is not required by the Establishment Clause.

Even if we accept that the Duval County School Board exerted overwhelming control over the graduation ceremony in terms of the event's sequence, venue, dress, and facilities, it is clear that it did not have control over the elements which are most crucial in the Establishment Clause calculus: the selection of the messenger, the content of the message, or most basically, the decision whether or not there would be a message in the first place. It is beyond imagination to say that everyone on the platform at a high school graduation ceremony, including a local politician or celebrity, is a state speaker merely because the state has provided the platform, onto which private individuals may be invited to share their privately-held views. Such views do not become the state's views merely by being uttered at a state event on a state platform.

15

Otherwise, each "open forum" case in which the Supreme Court found that granting religious groups access to generally available public facilities or benefits through neutral selection criteria was not an unconstitutional state endorsement of religion would be wrongly decided. *See Pinette,* 515 U.S. at 762-70, 115 S.Ct. 2440, 132 L.Ed.2d 650; *id.* at 772-83, 115 S.Ct. 2440, 132 L.Ed.2d 650 (O' Connor, J., concurring in the judgment); *id.* at 783-94, 115 S.Ct. 2440, 132 L.Ed.2d 650 (Souter, J., concurring in the judgment); *Rosenberger,* 515 U.S. at 839-46, 115 S.Ct. 2510, 132 L.Ed.2d 700; *Lamb's Chapel,* 508 U.S. at 395-97, 113 S.Ct. 2141, 124 L.Ed.2d 352; *Mergens,* 496 U.S. at 248-53, 110 S.Ct. 2356, 110 L.Ed.2d 191; *Widmar,* 454 U.S. at 271-79, 102 S.Ct. 269, 70 L.Ed.2d 440. For by Appellants' logic, the mere provision of a state-controlled forum or subsidy to private speakers automatically converts private speech into government speech.

In addition, a *per se* rule that all speech on a state-controlled platform is state speech, raises core free expression concerns and would likely run afoul of the Free Exercise and Free Speech clauses. *See Chandler,* 180 F.3d at 1261 (stating that "[b]ecause genuinely student-initiated religious speech is *private* speech endorsing religion, it is fully protected by both the Free Exercise and Free Speech Clauses of the Constitution") (emphasis added). Even if we were to construe a graduation ceremony as a "nonpublic forum," Duval County students still would possess free speech rights there. The Supreme Court has consistently held that in nonpublic fora the government may not engage in viewpoint discrimination. *See Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.,* 473 U.S. 788, 806, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985) (finding that "[c]ontrol over access to a nonpublic forum can be based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are *viewpoint neutral* ") (emphasis added); *Perry Educ. Assn. v. Perry Local Educators' Assn.,* 460 U.S. 37, 46, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983) (observing that "the state may reserve [ ] [a nonpublic] forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view"). The Court has also concluded that

16

religion is a viewpoint which, for First Amendment purposes, may provide "a specific premise, a perspective, a standpoint from which a variety of subjects may be discussed and considered." *Rosenberger,* 515 U.S. at 831, 115 S.Ct. 2510, 132 L.Ed.2d 700.

Presumably, a student's religious perspective would inform his views on a variety of subjects ordinarily dealt with at graduation such as expressing gratitude to his family or religious community, reflecting on the meaning of his school experience, or defining his future goals. The extremely personal and subjective nature of such views helps to explain why the School Board policy yields private rather than public speech. To unnecessarily classify student speakers as government actors could render Duval County students powerless to express religiously-inspired or religiously-influenced opinions at graduation. It also would effectively compel the Duval County School Board, if it wants to have any speech on topics where religion might motivate opinion or mould perspective, to engage in viewpoint discrimination, "an egregious form of content discrimination," *Rosenberger,* 515 U.S. at 829, 115 S.Ct. 2510, 132 L.Ed.2d 700, in the name of secular purity.

The expression of religious beliefs, which are sacred to some listeners, may be offensive to others. Appellants' desire to insulate students and other attendants at graduation from the offense that they may well experience at hearing religious expression with which they strongly disagree is altogether understandable. Graduation ceremonies are designed to be joyous occasions for the celebration of student achievement. But the Constitution does not prohibit the exercise of offensive speech at graduation ceremonies, religious or otherwise; it only prohibits state expressions of religion. While the School Board is under no compulsion to provide an opportunity for free expression by one or more students at a graduation ceremony, the Constitution certainly does not prohibit the School Board from doing so. The occasional tolerance of speech we may deem offensive is one price we pay for the First Amendment and our democratic traditions.

Second, we reject the claim that allowing students to vote for a graduation message and to select the student speakers automatically places the imprint of the state on the student speakers' privately-crafted

17

messages. Appellants' leap of logic, taking a selected student representative and, without explanation, turning her into a state actor by virtue of a democratic student vote, strains credulity. At most, a student speaker selected by a class vote is a representative of the student body, not an official of the state. She has no power or authority or official capacity to inform, carry out, or guide state policy. It is wholly unconvincing to argue that the student becomes a state actor because she was chosen by her peers, unless each high school student individually is considered to be a state actor, or somehow the students, acting in concert, come to be vested with the power of the state.

Consider two examples. First, consider the case of the selection of a Homecoming Queen. While she may be selected by a vote, or plebiscite of the entire senior class, the Homecoming Queen cannot be characterized as a state actor, or a representative of the state, merely because she holds a "public" position and sits atop the Homecoming float. Imagine, second, the example of replacing the traditional valedictory address with the practice of affording the students of the graduating class the opportunity to select the graduation student speaker through a vote by the entire class. In this hypothetical, the student speaker is selected, not by the School Board on the basis of grades, but by the students on the basis of student choice—be it popularity, ability to entertain, achievement in athletics, or for some other reason. Again, it strains reason and common sense to suggest that, by virtue of her selection by the majority of the senior high school class, the student speaker becomes a mouthpiece of the state. Both examples suggest that the senior class's act of voting does not, in any way, turn the senior class vote into state action, nor turn the chosen student into a state actor. Because Duval County policy utilizes this same methodology, affording the students of the senior class the opportunity to vote whether or not to have a message and to select a student speaker, in a wholly secular way, the graduation message vote is no more vested with the imprimatur of the state than are the votes for graduation class speaker or Homecoming Queen.

While the line between "what is 'private' action and what is 'state' action is not always easy to determine," Appellants have in no way proven that the students' private conduct has become so "entwined

with government policies" or so "impregnated with governmental character" as to become subject to the constitutional limitations placed on state action. *Evans v. Newton,* 382 U.S. 296, 299, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966) (citing *Burton v. Wilmington Parking Auth.,* 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961)). All of the policy's central decisions—who speaks, whether there will be a speaker, and what the content of the speech may be—are uncontrolled by the state. Indeed, the Duval County policy itself states that its purpose is "to allow students to direct their own graduation message without monitoring or review by school officials." The mere delegation of decision-making to pick a speaker alone does not place the state's imprint on a graduation prayer delivered by an autonomous student speaker who is free to give a message of unrestricted content.

In fact, the state's only involvement in the graduation message is to provide students with the opportunity to vote, to impose a time limit of two minutes, and to direct that the message be delivered at the beginning and/or closing of the ceremony. If the senior class were asked to vote whether to have a student deliver a poem or sing a song at their graduation exercise, under the same time and sequence restraints of the Duval County graduation message policy, that act still would involve the selection of a private, autonomous speaker through a neutral criterion. The Duval County policy does nothing more. It simply creates a neutral mechanism whereby the students can elect to have an unrestricted message and select a student speaker.

These facts do not establish that the state has so insinuated itself into the decision so as to transform an elected student's private speech into an utterance of the state. Where the student is chosen in a neutral and secular way *and* where the student is allowed complete autonomy over the message, the student's speech is her own.

B.

The other dominant fact of *Lee*—whether Duval County students are coerced "to support or participate in religion or its exercise" by the School Board policy, 505 U.S. at 587, 112 S.Ct. 2649, 120 L.Ed.2d 467—is largely determined by the measure of state control over the message at a graduation

19

ceremony, rather than state control over the ceremony itself. We do not quarrel with the Court's suggestion in *Lee* that students feel compelled to attend graduation, *see id.* at 593-97, 112 S.Ct. 2649, 120 L.Ed.2d 467, and that schools "retain a high degree of control" over graduation ceremonies, *id.* at 597, 112 S.Ct. 2649, 120 L.Ed.2d 467. But these conclusions do not suffice to decide the issue of coercion under these circumstances. The focus must be on whether the state has endorsed the message in an appreciable manner, which, when combined with the inherent nature of the graduation ceremony, obliges students to participate in a religious exercise. *See Lee,* 505 U.S. at 594, 112 S.Ct. 2649, 120 L.Ed.2d 467 (explaining that "[t]he injury caused by the government's action ... is that the State, in a school setting, in effect required participation in a religious exercise").

Here, neither the Duval County schools nor the graduating senior classes even decide if a religious prayer or message will be delivered, let alone "require" or "coerce" the student audience to participate in any privately-crafted message. While schools may make private religious speech their own by endorsing it, schools do not endorse all speech that they do not censor. We cannot assume, as Appellants do, that Duval County seniors will interpret the school's failure to censor a private student message for religious content as an endorsement of that message—particularly where the students are expressly informed as part of the election process that they may select a speaker who alone will craft any message. While there may be pressures on students to attend graduation and conform with their peers, *see Lee,* 505 U.S. at 593-95, 112 S.Ct. 2649, 120 L.Ed.2d 467, the state's complete control over a religious exercise, essential to *Lee's* holding, *see id.* at 590, 505 U.S. 577, 112 S.Ct. 2649, 120 L.Ed.2d 467 (finding that "[t]he degree of school involvement here made it clear that the graduation prayers bore the imprint of the State ..."); *id.* at 597, 505 U.S. 577, 112 S.Ct. 2649, 120 L.Ed.2d 467 (noting that "the state-imposed character of an invocation and benediction by clergy selected by the school combine to make the prayer a state-sanctioned religious exercise ..."), is conspicuously absent here. Moreover, whatever majoritarian pressures are attendant to a student-led prayer pursuant to a direct student plebiscite on prayer are not facially presented by the Duval County policy.

20

Appellants also assume that allowing the senior class to vote whether to have a graduation "message" unrestricted in content and to select an autonomous student speaker will have the effect of coercing any chosen speaker into placating the majority's religious sensibilities by offering a sectarian message of which the majority approves. This argument is highly remote and speculative. Even the scant record before us suggests an opposite conclusion. While ten of the graduation messages delivered pursuant to the policy involved some sort of religious content, the other seven Duval County graduations either had no student message or a wholly secular message. In the second place, this argument would be far better suited to an as-applied challenge, where the record has been properly developed, rather than to a facial challenge. A facial challenge to be successful "must establish that *no* set of circumstances exists under which the Act would be valid." *United States v. Salerno,* 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987) (emphasis added). Appellants' argument simply ignores the plain text of the policy which only permits graduating students to decide through a vote whether a student volunteer shall give a message of her choice. No religious result is preordained under the policy. On its face, the policy is constitutional under *Lee.*

III.

We reach the same conclusion when the graduation policy is measured against the three-part *Lemon* test. Under *Lemon,* we must evaluate whether: first, the policy has a secular purpose; second, the policy has a primary effect that neither advances nor inhibits religion; and finally, the policy fosters an excessive government entanglement with religion. *See Lemon,* 403 U.S. at 612-13, 91 S.Ct. 2105, 29 L.Ed.2d 745.

A.

We begin with the policy's purpose. *Lemon* requires that a statute must have "a secular legislative purpose." 403 U.S. at 612, 91 S.Ct. 2105, 29 L.Ed.2d 745. A statute will only violate this prong if it is "entirely motivated by a purpose to advance religion." *Wallace v. Jaffree,* 472 U.S. 38, 56, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985); *see also Bowen v. Kendrick,* 487 U.S. 589, 602, 108 S.Ct. 2562, 101 L.Ed.2d 520 (1988) (stating that a court "may invalidate a statute only if it is motivated wholly by an impermissible

21

purpose") (citations omitted); *Lynch v. Donnelly*, 465 U.S. 668, 680, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984) (observing that "[t]he Court has invalidated legislation or governmental action on the ground that a secular purpose was lacking, but only when it has concluded there was no question that the statute or activity was motivated wholly by religious considerations").  A statute may satisfy *Lemon* 's first prong even if it is "motivated in part by a religious purpose." *Wallace,* 472 U.S. at 56, 105 S.Ct. 2479, 86 L.Ed.2d 29.

Moreover, the Supreme Court has instructed us to be "deferential to a State's articulation of a secular purpose," *Edwards v. Aguillard,* 482 U.S. 578, 586, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987), particularly where "a legislature expresses a plausible secular purpose" for a policy or action, *Wallace,* 472 U.S. at 74, 105 S.Ct. 2479, 86 L.Ed.2d 29 (O'Connor, J., concurring in the judgment).  We respect that purpose unless it is insincere or a "sham," *Edwards,* 482 U.S. at 586-87, 107 S.Ct. 2573, 96 L.Ed.2d 510; *Bown,* 112 F.3d at 1468, or the statute at issue has a "preeminent purpose" which is "plainly religious in nature," *Stone v. Graham,* 449 U.S. 39, 41, 101 S.Ct. 192, 66 L.Ed.2d 199 (1980) (per curiam);  *see also Edwards,* 482 U.S. at 591, 107 S.Ct. 2573, 96 L.Ed.2d 510;  *Wallace,* 472 U.S. at 56-60, 105 S.Ct. 2479, 86 L.Ed.2d 29.  But the Supreme Court has been reluctant to attribute an unconstitutional motive where a "plausible" secular purpose may be discerned from the statute.  *Mueller v. Allen,* 463 U.S. 388, 394-95 & n. 4, 103 S.Ct. 3062, 77 L.Ed.2d 721 (1983).

Additionally, "[i]nquiry into legislative purpose begins with interpreting the law itself." *Church of Scientology v. City of Clearwater,* 2 F.3d 1514, 1527 (11th Cir.1993).  That requires close attention be paid to the plain language of the policy.  For the most part, statutes which the Supreme Court has invalidated for lack of secular purpose have openly favored religion or demonstrated a religious purpose on their face. *See, e.g., Edwards,* 482 U.S. at 593, 107 S.Ct. 2573, 96 L.Ed.2d 510 (invalidating a Louisiana law that required creationism to be discussed with evolution in public schools); *Wallace,* 472 U.S. at 57-58, 105 S.Ct. 2479, 86 L.Ed.2d 29 (overturning an Alabama statute that authorized a moment of silence because the state made no attempt to justify the statute in terms of any secular purpose); *Stone,* 449 U.S. at 41, 101 S.Ct. 192, 66

L.Ed.2d 199 (striking down a Kentucky statute requiring the posting of the Ten Commandments in public classrooms); *Engel v. Vitale,* 370 U.S. 421, 424, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962) (holding unconstitutional a New York law authorizing state-directed daily classroom prayer in public schools).

In contrast, three secular purposes are plainly encompassed by the Duval County policy. First, the Duval County policy, by its very words, articulates a secular purpose; namely, affording graduating students an opportunity to direct their own graduation ceremony by selecting a student speaker to express a message. By choosing whether to have a graduation message, and if so, the student speaker, the graduating class shares, at least in part, in the civic responsibility of planning their graduation ceremony. *See Jones,* 977 F.2d at 966 (finding that "[a] meaningful graduation ceremony can provide encouragement to finish school and the inspiration and self-assurance necessary to achieve after graduation, which are secular objectives").

Second, the School Board policy allows students to solemnize graduation as a seminal educational experience. *See Lynch,* 465 U.S. at 693, 104 S.Ct. 1355, 79 L.Ed.2d 604 (O'Connor, J., concurring) (noting "the legitimate secular purposes of solemnizing public occasions, expressing confidence in the future, and encouraging the recognition of what is worthy of appreciation in society"); *see also Chaudhuri v. Tennessee,* 130 F.3d 232, 236 (6th Cir.1997); *Tanford v. Brand,* 104 F.3d 982, 986 (7th Cir.1997); *Jones,* 977 F.2d at 966-67. This purpose is not drained of its secular character merely because the policy invites consideration of meaning and values in the context of a graduation ceremony. And it would be very damaging to public education if the Establishment Clause were to be seen as inhibiting any reflection by a student of transcendent meaning and value in life, whether grounded in religion or not.

Finally, the School Board's policy also evinces an important and long accepted secular interest in permitting student freedom of expression, whether the content of the expression takes a secular or religious form. *See Pinette,* 515 U.S. at 760, 115 S.Ct. 2440, 132 L.Ed.2d 650 (noting that "[o]ur precedent establishes that private religious speech, far from being a First Amendment orphan, is as fully protected under the Free Speech Clause as secular private expression"); *Mergens,* 496 U.S. at 249, 110 S.Ct. 2356, 110 L.Ed.2d 191

23

(stating that "prevent[ing] discrimination against religious and other types of speech" has an "undeniably secular" purpose.); *Americans United For Separation of Church and State v. City of Grand Rapids,* 980 F.2d 1538, 1543 (6th Cir.1992) (en banc) (explaining that a "policy of treating religious speech the same as all other speech certainly serves a secular purpose").

Nevertheless, Appellants suggest that the policy has no true secular purpose and they posit three arguments to show that any avowed secular purpose is actually a "sham." They claim first, that the School Board promulgated the policy as a means to evade the strictures of *Lee;* second, that the policy's solely sectarian purpose is established by the title of the Reynolds Memorandum, "Graduation Prayer"; and finally, that comments made by some members of the School Board, notably after the policy had been promulgated and distributed in Duval County, likewise evince a wholly sectarian purpose.

Before examining Appellants' specific claims, we first note that Appellants, without any case authority, ignore the plain text of the policy and its explicitly stated secular purpose, as if there were none. Appellants would divine a wholly sectarian purpose merely by looking at the antecedent history, the title, and the post-enactment debate surrounding the graduation policy. While it is appropriate to consider both the "legislative history and the specific sequence of events leading up to the adoption of the statute," it is, "of course, necessary to examine the language of the statute on its face." *Bown,* 112 F.3d at 1469 (citing *Edwards,* 482 U.S. at 594, 107 S.Ct. at 2583; *Church of Scientology,* 2 F.3d at 1527).

As for Appellants' first claim, Appellants cite no persuasive evidence that the Duval County policy was promulgated to evade the strictures of *Lee.* Inferring the subjective motivations of policymakers is always a tricky proposition. "[W]hile it is possible to discern the objective 'purpose' of a statute (i.e., the public good at which its provisions appear to be directed), or even the formal motivation for a statute where that is explicitly set forth, ... discerning the subjective motivation of those enacting the statute is, to be honest, almost always an impossible task. The number of possible motivations, to begin with, is not binary, or indeed finite." *Edwards v. Aguillard,* 482 U.S. 578, 636-37, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987) (Scalia, J., dissenting).

24

In this case, that task is made even more difficult because we have no record from which to fairly infer the motivation of those who promulgated or distributed the policy. In so far as we attempt to divine purpose from the decision-makers, "to the extent that the School Board was the institutional policy maker (rather than Superintendent Zenke and/or Ms. Reynolds)," the district court found that the "purposes or intentions of the members of the Board are unknown. No debate was had and no vote was taken on the Reynolds Memorandum of May 5." *Adler I,* 851 F.Supp. at 451. To the extent that we focus on the motives of Mr. Zenke or Ms. Reynolds, the district court found mixed motives or purposes—to permit students to solemnize the event, to afford the student body the opportunity to select a messenger, who, in turn would, with complete autonomy, choose a secular or sectarian message, and to afford the students the option of having no message at all. *See id.* at 452.

Appellants offer no good reason to disturb the district court's findings which are grounded in the facially neutral language of the Reynolds Memorandum. Appellants principally rely on the pre-policy history. A review of the pertinent history, however, yields only the observations that prior to *Lee* Duval County had a long tradition of clergymen offering prayers at commencement ceremonies, that in the wake of *Lee* in 1992 the School Board terminated the practice, and that thereafter many members of the community expressed strong views about the policy one way or the other. Appellants highlight the fact that some community members wrote letters imploring Zenke and the Board to find a way to maintain the graduation prayer tradition. It would be an especially dangerous practice if a court could somehow discern legislative purpose, not from the text of the policy, nor from its explicitly stated purpose, nor even from a decision-making body that has offered no debate from which to find purpose, but, rather, simply from the controversy surrounding the subject and the heartfelt and often conflicting views expressed by many members of the community.

In addition, the fact that the Reynolds Memorandum discusses *Lee* and the question of whether student-initiated, student-led graduation prayer is constitutional does not establish that the policy's secular

25

purposes are a "sham." *Edwards,* 482 U.S. at 586-87, 107 S.Ct. 2573, 96 L.Ed.2d 510; *Bown,* 112 F.3d at 1468. There is nothing inappropriate about a school system attempting to understand its constitutional obligations and to instruct school officials on how to comply with the law. The Reynolds Memorandum simply explained that in spite of *Lee* the law was unclear on the student prayer issue and that the School Board had been threatened with "lawsuits from both sides on the issue depending on what action" they took. The memorandum, in no way, expressed a desire or preference for student prayer at graduation ceremonies. It simply acknowledged that *Lee* forbade graduation prayers "directed and initiated by the school system" rather than student-initiated, student-led prayers. Moreover, as the memorandum made clear, the policy's stated purpose is plainly secular, "to allow students to direct their own graduation message without monitoring or review by school officials," and its features are strictly content-neutral and equally accommodating of secular and sectarian student messages. At worst, the memorandum can be read as contemplating that student prayers could be offered pursuant to the graduation policy and that such occurrences were not strictly forbidden by *Lee.* Such a supposition does not come close to rendering the policy's secular purposes a sham.

Appellants next suggest that the title of the Reynolds Memorandum, "Graduation Prayer," supports the conclusion that the School Board policy was driven solely by sectarian concerns. The title, however, merely introduces the topic of debate within Duval County in the aftermath of *Lee,* rather than suggesting, let alone compelling, the outcome of that debate. The title affixed to the Reynolds Memorandum does no more than alert the reader to the general subject matter of the text; and it remains the language and substance of the policy, rather than its title, that is controlling. It is altogether unnecessary to requisition the title to cast doubt on the clear and unambiguous purpose of the policy. The crucial term "message" is fully defined by the text of the policy, which provides that the decision whether to have a message is left to the students, that the student body shall choose the student speaker, that the message is limited to two minutes in length, that the message shall take place at the beginning and/or closing of the graduation ceremony, and, finally, that the

content of the message shall be prepared by the student speaker without monitoring or review by the School Board. The title cannot take the place of a detailed review of the policy's facial provisions, let alone create a wholly sectarian purpose out of a textually neutral pronouncement.

Besides being unnecessary, use of the title to inform the plain meaning of the policy's language is improper. Indeed, even if we were examining the title of a statute or legislative codification—and we are doing far less than that here—the Supreme Court has warned that "the title of a statute and the heading of a section cannot limit the plain meaning of the text. For interpretive purposes, they are of use only when they shed light on some ambiguous word or phrase. They are but tools available for the resolution of a doubt. But they cannot undo or limit that which the text makes plain." *Brotherhood of R.R. Trainmen v. Baltimore & Ohio R.R. Co.,* 331 U.S. 519, 528-29, 67 S.Ct. 1387, 91 L.Ed. 1646 (1947). Both we and our predecessor court have repeatedly employed this principle of statutory construction when interpreting the statutory text. *See, e.g., North Ala. Express, Inc. v. Interstate Commerce Comm'n,* 971 F.2d 661, 664 (11th Cir.1992) (declaring that " '[s]ection and chapter titles cannot alter the plain meaning of a statute; they can only assist in clarifying ambiguity' ") (citation omitted); *Scarborough v. Office of Personnel Management,* 723 F.2d 801, 817 (11th Cir.1984) (noting that "reliance upon headings to determine the meaning of a statute is not a favored method of statutory construction"); *Rich v. Commissioner of Internal Revenue Serv.,* 250 F.2d 170, 175 (5th Cir.1957) (stating that "[t]he plain and unambiguous meaning of the text of the section cannot be extended by its title or heading").

Finally, Appellants point to post-enactment comments of some members of the School Board made at a June 1, 1993 meeting as evidence of the School Board's wholly sectarian purpose to permit graduating students to pray. However, the district court observed that "[t]he motivation or intent of the Board relative to the Reynolds Memorandum of May 5 is essentially unknown." *Adler I,* 851 F.Supp. at 452. No debate was had and as far as the record reflects, no vote was taken on the Reynolds Memorandum. The June 1 comments were made almost a month after the policy was promulgated and distributed in the context of a

27

proposal to replace student-initiated messages with a moment of silence. The motion failed and the policy was left in force. At best, the vote can be viewed as a tacit endorsement of the Reynolds Memorandum. Furthermore, a review of the School Board's comments at this meeting do not establish that the School Board sought to direct or endorse graduation prayer via the Reynold Memorandum. The most one could say is that the statement of *one* School Board member at the June 1 meeting could be characterized as advocating direct school involvement with religion at graduation ceremonies.[8] Simply put, the post-enactment comments are not sufficient to transform the policy's express secular purpose into a preeminently religious purpose.

More importantly, regardless of how these post hoc statements are interpreted, they cannot be construed to override the policy's language articulating a clear secular purpose. *See Bown,* 112 F.3d at 1472. Indeed in *Bown,* we had occasion to find that the legislative history of a Georgia statute (mandating a period for quiet reflection in public schools), which contained some expressions of religious motives by several legislators who voted for the Act, could not "override the express statutory language articulating a clear

---

[8]Appellants cite to four post-enactment statements of School Board members to show that the School Board intended to permit graduating students to engage in prayer. In fact, the statements to which the Appellants refer generally buttress the conclusion that the School Board's policy was not a sham. Of those four statements, only the statement of Board member Bill Parker can be characterized as advocating direct school involvement with religion at graduation ceremonies. *See* Tr. of Duval County Sch. Bd. Meeting at 2 ("I think that our school principals should be allowed to work out a non-sectarian message with our student chaplains, or a guest minister, rabbi or whatever that would be acceptable to all at this very important time in our young people's lives."). The statements of Don Buckley and Nancy Corwin, while generally supportive of religion, acknowledge that an intended effect of the policy is to insulate the content of messages from school influence. *See id.* at 5 (Buckley) ("I think the only way we can keep ourselves clear on this thing is to keep ourselves out of what happens in this area of the graduation ceremony."); (Corwin) ("I also believe that the democratic process in which seniors were given the ability to choose which form of inspirational message, if any, they wanted at their commencement was an appropriate one and I'm going to stand by it."). Rather than betraying an illegitimate intent to ensure that prayer take place at graduation ceremonies, these statements indicate that Buckley and Corwin perceived the School Board policy as disassociating the school hierarchy from student messages. The fourth statement referenced by Appellants, that of Board member Stan Jordan, was also supportive of the policy. *See id.* at 8 ("I plan to vote for the administration plan and against the proposal that's on the table."). Taken as a whole, these utterances by School Board members constitute recognition that the old regime of state-directed school prayer in Duval County had passed and been replaced by a new regime over which they had far less control.

28

secular purpose."[9] *Id.* Here, we have even far less evidence of a sectarian policy purpose on the part of the School Board or their principals.

In sum, whether standing alone or in concert, the three pieces of evidence cited by Appellants cannot strip the policy of a secular purpose. No matter what an individual board member may have hoped—and they said nothing on the record about codifying *this* policy—Duval County's policy is facially neutral and undeniably evinces a secular purpose. That is enough to pass constitutional muster under the first prong of *Lemon.*

B.

As for whether the policy has the primary effect of advancing religion, we conclude that because the policy, on its face, allows a student message on any topic of the student's choice it satisfies the second prong of *Lemon.* The Duval County School Board policy is content-neutral and does not mandate or even encourage that a graduation prayer will be uttered. As the district court found, the implementation of the policy may result in no graduation prayer at all. *See Adler I,* 851 F.Supp. at 454. While it is undoubtably true that an autonomous student speaker could read a prayer at graduation under the policy, it is equally true that the same speaker may opt for a wholly secular message instead. It would require a strain of the term "primary" to suggest that a content-neutral forum policy, which accommodates private sectarian and secular speech on an equal basis, has the "primary" or "principal" effect of advancing religion.

Moreover, we believe that a student's private choice to deliver a religious message at graduation is a religious effect attributable to the student rather than to the facial terms of the Duval County policy. As the

---

[9]Appellants cite *Jager v. Douglas County Sch. Dist.,* 862 F.2d 824 (11th Cir.1989), for the proposition that a policy, whose actual purpose is to promote prayer or is "intrinsically religious," *Id.* at 830, cannot meet the secular purpose prong of *Lemon.* But *Jager* does no more than state the obvious, that in order to meet *Lemon* 's first prong, a government policy must have a genuine secular purpose and not be a sham. *See Edwards,* 482 U.S. at 586-87, 107 S.Ct. 2573, 96 L.Ed.2d 510. If a policy's "actual purpose" is wholly religious then *Lemon* 's secular purpose requirement is not satisfied. In *Jager,* we held that a school district's practice of having representatives of student organizations deliver invocations prior to football games had as its "preeminent purpose" the endorsement of Protestant Christianity. *Id.,* 862 F.2d at 830. The only discretion left to the students was the selection of who would pray.

Supreme Court has explained, "to have forbidden 'effects' under Lemon, it must be fair to say that the government itself has advanced religion through its own activities and influence." *Corporation of Presiding Bishop of Church of Jesus Christ Latter-Day Saints v. Amos,* 483 U.S. 327, 337, 107 S.Ct. 2862, 97 L.Ed.2d 273 (1987). Here, the policy strips the School Board of any authority over the central decisions—who speaks, whether there will be a speaker, and what the content of the speech may be. Indeed, in order to ensure that no one perceives any student's religious utterance as being the state's prayer, the policy explicitly divorces any student message from School Board sponsorship by specifically stating that any message will be "prepared by the student volunteer and shall not be monitored or otherwise reviewed" by the School Board or its employees. This language acts as an overt disclaimer, further distancing the state from the student message.

Our conclusion is amply supported by Supreme Court caselaw. The Court, under *Lemon,* repeatedly has upheld facially neutral programs that permit individuals to support religion through their own private choices. *See, e.g., Agostini,* 521 U.S. at 223-232, 117 S.Ct. 1997, 138 L.Ed.2d 391 (upholding New York program of sending public school teachers into parochial schools to provide remedial education where aid was made available to religious and secular beneficiaries on a nondiscriminatory basis); *Zobrest,* 509 U.S. at 8-12, 113 S.Ct. 2462, 125 L.Ed.2d 1 (sustaining section of Individual with Disabilities Act providing disabled children with aid regardless of whether a child attends a sectarian institution); *Witters,* 474 U.S. at 488, 106 S.Ct. 748, 88 L.Ed.2d 846 (holding that Establishment Clause was not violated when the state paid a blind student's tuition at a Christian college through a generally-applicable aid program because any public aid that reached religious institutions under the program was "a result of the genuinely independent and private choices of aid recipients"); *Mueller v. Allen,* 463 U.S. at 399, 103 S.Ct. 3062, 77 L.Ed.2d 721 (upholding a state tax deduction for specified educational expenses, and characterizing any such aid to religion as being "only as a result of numerous, private choices of individual parents of school-age children"). The Duval County policy allows elected student speakers the freedom to privately choose a graduation

message of an either secular, sectarian, or mixed nature. We therefore find that the Duval County policy does not have a primary effect of advancing religion.

C.

For many of the same reasons, we conclude that the School Board's policy does not excessively entangle the Board with religion in violation of the third part of the *Lemon* test.[10] The policy remains facially neutral with respect to religion, requiring only that graduation messages be voted on by students, and composed and directed by a student speaker. By its very terms, the policy explicitly prohibits any review of the student message at all. Undoubtedly, the School Board would find itself far more entangled with religion if it attempted to eradicate all religious content from student messages than if it maintained a meaningful policy of studied neutrality. *See Mergens,* 496 U.S. at 253, 110 S.Ct. 2356, 110 L.Ed.2d 191 (stating that "a denial of equal access to religious speech might well create greater entanglement problems in the form of invasive monitoring to prevent religious speech at meetings at which such speech might occur"); *Widmar,* 454 U.S. at 272 n. 11, 102 S.Ct. 269, 70 L.Ed.2d 440 (noting that schools who adopt open-forum policies for private secular and religious groups equally "would risk greater 'entanglement' by attempting to enforce its exclusion of 'religious worship' and 'religious speech' "); *Chabad-Lubavitch,* 5 F.3d at 1389; *Jager,* 862 F.2d at 831.

Implicit in Appellants' rationale is the need for school censorship if schools are to allow students the opportunity to speak at graduation at all. At the core of Appellants' position is the claim that the state's control over nearly all aspects of the graduation ceremony automatically imputes all private speech to the state. But the degree of control that schools generally exert over high school graduation ceremonies is unlikely to diminish because graduation ceremonies are, by their nature, highly choreographed. Appellants' position therefore would leave school officials with only two choices: either eliminate student speech

---

[10]Recently, in *Agostini,* the Court merged the second and third *Lemon* prongs because "the factors we use to assess whether an entanglement is 'excessive' are similar to the facts we use to examine 'effect.' " *Id.,* 521 U.S. at 232, 117 S.Ct. 1997.

altogether or retain student speech, subject to censorship by school authorities. If school officials choose the latter course, they will be left with the unenviable task of identifying the religious content in student speeches for excision prior to graduation or of interrupting renegade graduation speakers who resort to sectarian speech.[11] If, however, they choose the former, they will have deprived the graduation class of any role in shaping its high school graduation and they will have banned all private student expression. The Establishment Clause requires no such Hobson's choice. What it does require is a recognition of the critical difference between a private statement of religious values and a religious utterance endorsed by the state. The Duval County School Board's policy, on its face, does no more than recognize this distinction.

IV.

Based on the foregoing, we hold that the Duval County school system's policy of permitting graduating students to decide through a vote whether to have an unrestricted student graduation message at the beginning and/or closing of graduation ceremonies does not facially violate the Establishment Clause. We therefore affirm the judgment of the district court.

AFFIRMED.

KRAVITCH, Senior Circuit Judge, *dissenting,* in which BARKETT, Circuit Judge, joins:

I agree with the majority that the Supreme Court's decisions in *Lee v. Weisman,* 505 U.S. 577, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992), and *Lemon v. Kurtzman,* 403 U.S. 602, 612-13, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971), control this case. I disagree, however, with the majority's application of those decisions to the facts of this case. The majority articulately defends the constitutionality of the Duval County

---

[11]There is no easy or precise guideline for school officials to follow when excising student speech of religious content. The constitutional definition of religion is expansive; it encompasses "all sincere religious beliefs which are based upon a power or being, or upon a faith, to which all else is subordinate or upon which all else is ultimately dependent" and "which occupies in the life of its possessor a place parallel to that filled by [ ] God." *United States v. Seeger,* 380 U.S. 163, 176, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965). Moreover, the beliefs "need not be acceptable, logical, consistent, or comprehensible to others." *Thomas v. Review Bd.,* 450 U.S. 707, 714, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981). Moreover, if the School Board's censorship was not "rigorous" enough to prevent religion from creeping into graduation ceremonies, a policy of allowing even monitored student speech still would be subject to constitutional attack.

32

graduation policy, but the analysis is flawed by an unwillingness to look beyond the policy's terms. A broader, more contextual appraisal leads me to conclude that the Duval County policy violates the Establishment Clause of the First Amendment. Therefore, I respectfully dissent.

In *Lee,* 505 U.S. at 586, 112 S.Ct. at 2655, the Supreme Court held a graduation ceremony unconstitutional because (1) school officials were overly involved with the delivery of a prayer, and (2) audience members were in effect required to participate in a formal religious exercise. Admittedly, the link between the Duval County policy and resulting prayer at graduation ceremonies is not as direct as in *Lee.* But although the Duval County school administration may have *distanced* itself from prayer offered during graduation ceremonies, it did not *disconnect* itself from religious expression. Nor does the policy mitigate the influences that coerce audience members to participate in prayers offered at graduation.

Although *Lee* presents a specific example of an Establishment Clause violation, *Lemon,* 403 U.S. at 612-13, 91 S.Ct. at 2111, still provides the general Establishment Clause test. The Duval County policy runs afoul of the *Lemon* test because its only credible purpose is to maximize the chance that prayer will continue to play a prominent role in Duval County graduations. Furthermore, the policy's "primary effect" is to advance religion. The policy communicates an endorsement of religion both because it leads to more religious expression in the opening and closing messages than all other types of speech, and because its purpose is apparent to any reasonable observer aware of its terms, the graduation traditions in Duval County, and the events leading to the policy's creation.

Invoking the ideals of free student expression and referencing the public forum doctrine do not cleanse the Duval County policy of its constitutional defects. Allowing a student majority to do what the school administration could not offends our constitutional scheme of individual rights. Nor does the policy promote free expression or render the graduation ceremony equally available for any sort of speech-not when it allows for only one speaker, and a speaker chosen by majority vote at that.

In addition to disagreeing with the majority's facial analysis of the Duval County policy, I take issue with the conclusion that the plaintiffs waived their as-applied claims. After analyzing the Duval County policy under both *Lee* and *Lemon,* and critiquing the majority's public forum analogy, this dissent concludes with a brief examination of the procedural posture of the case and the district court's order advancing the trial on the merits.

A.    Lee v. Weisman

The starting point for the analysis of the Duval County policy is *Lee v. Weisman,* 505 U.S. 577, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992), because it is the only Supreme Court case involving prayer at public school graduation ceremonies. In *Lee,* a principal invited a rabbi to give a prayer at the school's graduation ceremony and provided a pamphlet suggesting an appropriate tone and possible content for the presentation. *Id.* at 581, 112 S.Ct. at 2652. The Supreme Court found it unnecessary to apply the *Lemon* analysis in *Lee* because two "dominant facts" rendered the rabbi's prayer so clearly unconstitutional. *Id.* at 586, 112 S.Ct. at 2655. First, "[t]he government involvement with religious activity [was] pervasive, to the point of creating a state-sponsored and state-directed religious exercise in a public school." *Id.* at 587, 112 S.Ct. at 2655. Second, "the State, in a school setting, in effect required participation in a religious exercise." *Id.* at 594, 112 S.Ct. at 2659. The majority purports to evaluate Duval County's policy in light of the standards enunciated in *Lee,* but it both understates the degree of state direction relevant for the first prong of the *Lee* analysis and effectively writes *Lee*'s second "dominant fact," coerced participation, out of the opinion by conflating it with the state's control over the religious exercise itself.

1.    *State Control*

In *Lee,* state actors made the decision to include an invocation and benediction in the graduation ceremony, selected the speaker, and suggested an appropriate tone for the message. *Id.* at 587-88, 112 S.Ct. at 2655-56. These elements of state involvement are of constitutional import because they "made it clear that the graduation prayers bore the imprint of the State." *Id.* at 590, 112 S.Ct. at 2657. Admittedly, the Duval

34

County policy is not as egregious as the practice scrutinized in *Lee*. The state involvement with prayers offered through the operation of the policy, however, is still too extensive to comport with the Establishment Clause.

In its own search for state involvement, the majority focuses on the student standing alone at the podium delivering an uncensored message, but ignores how she got there. A broader inquiry reveals that the state directs the exercise of prayer at Duval County high school graduations because: (1) the programmatic constraints imposed by the graduation policy promote religious expression, especially given the context surrounding the policy's promulgation, (2) the election of a student to deliver the opening or closing "message" is state action, and (3) the vote for student speaker is based on the expected content of the candidate's message.

According to the majority, "[t]he School Board ... does not suggest in any way ... that the graduating class consider religious or any other criteria in deciding whether to have a student message or in selecting a particular student speaker." The policy does not permit the school administration to remain passive, however, and the policy's terms do encourage the senior class to consider religious criteria in planning the opening and closing.

Under the terms of the policy, it is the high school administration that organizes elections for the graduation program. The policy only allows for student input concerning the beginning and end of the ceremony-portions of the program appropriate for a limited range of speech. The policy also dictates that the opening and closing messages last no more than two minutes, further limiting the types of speech possible. The constraints of the policy itself provide clues about the type of message the school administration had in mind. In case students need more of a hint, however, history provides one. Until the year the policy went into effect, Duval County high school graduations had opened and closed with a prayer. As the district court noted, "[i]nvocations and benedictions have been traditional and are therefore familiar if not expected at high

35

school graduation ceremonies" in Duval County. *Adler v. Duval County Sch. Bd.,* 851 F.Supp. 446, 453 n. 9 (M.D.Fla.1994).

Moreover, the senior class vote is itself attributable to the state. The majority concludes otherwise because it views the students as making all of the "central" decisions regarding the opening and closing message. This logic undervalues the power of the policy's terms to influence the students' choices; it also treats the graduation "message" as if it were an independent event, rather than the opening and closing segment of a more substantial occasion, the graduation ceremony. This narrow perspective permits the majority to ignore the fact that the Duval County policy gives students control over only a tiny fraction of the graduation ceremony as a whole.[1]

The actions of a private party can be attributed to the state if they are taken in exercise of a right or privilege rooted in state authority, and if the private party can "in all fairness" be described as a state actor. *See Edmonson v. Leesville Concrete Co.,* 500 U.S. 614, 620, 111 S.Ct. 2077, 2082-83, 114 L.Ed.2d 660 (1991). Clearly, the student vote satisfies the first part of this analysis: but for the policy, the student vote would not occur. Before the policy went into effect, students may have had input, but ultimately the school administration decided whether to have a formal opening and closing segment of the graduation ceremony, and if so, what to include in those portions of the program.

---

[1]Both the Ninth and the Third Circuits have recognized that student decisions concerning particular aspects of their graduation ceremonies are attributable to the state. *See ACLU of N.J. v. Black Horse Pike Reg'l Bd. of Educ.,* 84 F.3d 1471 (3d Cir.1996); *Harris v. Joint Sch. Dist. No. 241,* 41 F.3d 447 (9th Cir.1994), *vacated with directions to dismiss as moot,* 515 U.S. 1154, 115 S.Ct. 2604, 132 L.Ed.2d 849 (1995). These courts both focused on the graduation ceremony as a whole. They noted that the school administration is ultimately responsible for the graduation ceremonies, and that "the seniors have authority to make decisions regarding graduation only because the school allows them to have it." *Harris,* 41 F.3d at 454; *see also, Black Horse Pike,* 84 F.3d at 1479. They also acknowledged the school's extensive involvement with other details of the graduation ceremony. *See Black Horse Pike,* 84 F.3d at 1479; *Harris,* 41 F.3d at 454. Only the Fifth Circuit has held that a student vote regarding prayer cannot be attributed to the state, *see Jones v. Clear Creek Indep. Sch. Dist.,* 977 F.2d 963, 970-71 (5th Cir.), *vacated,* 505 U.S. 1215, 112 S.Ct. 3020, 120 L.Ed.2d 892 (1992), but that holding is in tension with the more recent case of *Doe v. Santa Fe Indep. Sch. Dist.,* 168 F.3d 806 (5th Cir.1999), *cert. granted in part,* --- U.S. ----, 120 S.Ct. 494, 145 L.Ed.2d 381 (1999). In *Santa Fe,* the Fifth Circuit held that allowing proselytizing prayers at graduation violated the First Amendment, even though the senior class selected the speaker. 168 F.3d at 817.

Whether a private party can "in all fairness" be described as a state actor depends on whether the party's actions are "governmental in character." *See id.* at 621, 111 S.Ct. at 2083. Relevant to this analysis are: "the extent to which the actor relies on governmental assistance and benefits; whether the actor is performing a traditional governmental function; and whether the injury caused is aggravated in a unique way by the incidents of governmental authority." *Id.* at 621-22, 111 S.Ct. at 2083 (citations omitted). Considered in light of these three factors, the student decisions made pursuant to the Duval County policy are "governmental in character."

First, the students vote not merely with the cooperation of the school authorities but at the behest of school district policy. They do so on school property, and the assistance or cooperation of the principal and faculty with administering the election must be presumed. Furthermore, students vote about a message that will be delivered at an event sponsored and controlled by the school.

Second, planning public school graduation ceremonies is a traditional governmental function. The Supreme Court noted in *Lee* that "teachers and principals must and do retain a high degree of control over the precise contents of the program, the speeches, the timing, the movements, the dress, and the decorum of the students." 505 U.S. at 597, 112 S.Ct. at 2660. Before the policy went into effect, the Duval County school administration had the power to plan every aspect of the graduation ceremonies, including the opening and closing, and the policy does not divest the administration of control over the graduation ceremonies generally.

Finally, prayers recited during the opening and closing portions of the ceremony have an injurious effect precisely because of the state association with the event. Most people properly perceive their everyday encounters with others' religious expression as an incidental requirement of life in a diverse society, rather than as a burden or attack on their own beliefs. *See Lee,* 505 U.S. at 628, 112 S.Ct. at 2677 (Souter, Stevens, & O'Connor, JJ., concurring). It is *government* participation in religious expression that offends the First Amendment because of its power to influence the inherently personal nature of religious faith, potentially

37

coercing religious minorities or even coopting mainstream sects. *See id.* at 591-92, 112 S.Ct. at 2657-58; *see also id.* at 608-09, 112 S.Ct. at 2666 (Blackmun, Stevens, & O'Connor, JJ., concurring).

The student vote satisfies the criteria for state action described in *Edmonson,* and other cases have identified state action in a similar context. These cases stand for the proposition that when government delegates authority over a portion of a public operation to an ostensibly private actor, but retains ultimate control over the larger operation, the exercise of the delegated authority is attributable to the state. Administering elections, for example, is a state function. Although states can give political parties and private associations a role in choosing candidates to appear on the ballot, the private entities' fulfillment of that role is state action. *See Terry v. Adams,* 345 U.S. 461, 469, 73 S.Ct. 809, 813, 97 L.Ed. 1152 (1953); *Smith v. Allwright,* 321 U.S. 649, 663, 64 S.Ct. 757, 765, 88 L.Ed. 987 (1944). The state cannot escape its responsibility to maintain an electoral system that comports with the Constitution by allowing non-governmental entities to control part of the electoral system. *See Terry,* 345 U.S. at 469, 73 S.Ct. at 813.

These rules do not only apply to fundamental governmental operations such as elections. For example, after a city has managed a park for a period of time, it cannot continue to maintain the facilities but avoid the Fourteenth Amendment's mandate to integrate by appointing private trustees to oversee the park. *See Evans v. Newton,* 382 U.S. 296, 301, 86 S.Ct. 486, 489, 15 L.Ed.2d 373 (1966). The park in *Evans* had acquired "momentum" as a public facility, and the city remained "entwined" in its operation. It was of no consequence that the trustees with official authority were not public employees, because "when private individuals or groups are endowed by the state with powers or functions governmental in nature, they become agencies or instrumentalities of the State and subject to its constitutional limitations."[2] *Id.* at 299, 86 S.Ct. at 488.

---

[2]Indeed, even if all maintenance and title to the land were in private hands, the park's management would have to comply with the Constitution because "the predominant character and purpose of [the] park are municipal." *Evans,* 382 U.S. at 302, 86 S.Ct. at 490.

38

So it is with Duval County's public high school graduation ceremonies, which have always been state-sponsored events. Through the graduation policy, the school administration delegates one decision to the senior class, but in all other ways "remains entwined in the management [and] control" of the graduation ceremonies. *Id.* at 301, 86 S.Ct. at 489.

The fact that the policy requires the senior class to exercise its decision-making authority through a majoritarian vote does not change the analysis. "One's ... fundamental rights may not be submitted to vote; they depend on the outcome of no elections." *West Virginia State Bd. of Educ. v. Barnette,* 319 U.S. 624, 638, 63 S.Ct. 1178, 1185-86, 87 L.Ed. 1628 (1943). After all, "[t]he very purpose of the Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities."[3] *Id.* at 638, 63 S.Ct. at 1185.

To further distance the state from the actual content of the opening and closing messages, the majority emphasizes that the senior class votes for a speaker, not a particular speech. The majority concludes that the selection of the student speaker is made in a content-neutral manner. It requires a logical leap, however, to move from the student speaker's limited autonomy to craft the graduation message to the conclusion that the senior class chooses the speaker without considering what she is going to say.

It is more realistic to acknowledge that students vote based on the anticipated content of the candidates' graduation message. Unlike typical elected offices with numerous responsibilities or strictly

---

[3]Under the majority's reasoning, student councils could, without prompting, vote to decorate each classroom with the Ten Commandments or to have a student volunteer begin each school day by reading a prayer over the public address system. In one sense the policy at issue in this case poses more of a constitutional problem than these examples. The student council's decisions would at least be genuinely student-initiated, but here the opportunity for an opening and closing message is created by the school administration and the vote is organized and influenced by school officials. Local government could undermine minority and individual rights in a similar fashion. In *County of Allegheny v. ACLU Greater Pittsburgh Chapter,* 492 U.S. 573, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989), the Supreme Court held that permitting the display of a creche in the Grand Staircase of a county courthouse violated the First Amendment. The majority's view here suggests that a town council in a religiously observant and overwhelmingly Christian community could bypass the holding in *Allegheny* by sponsoring an election each year for volunteer committees to decorate town hall in mid-December or in the weeks following the secular holiday of Mardi Gras. Such a procedure, however, would not alter the city's control over town hall or eliminate the symbolic connection between the religious decorations and the town government.

honorary positions such as the homecoming queen mentioned in the majority opinion, the graduation speaker is elected to carry out one very specific task: she must deliver a single speech that lasts less than two minutes. If the school board does not expect students to vote based on how they anticipate the candidates will perform that one responsibility, then why have an election at all?[4]

Factoring the content of the speech into the choice of speaker is problematic because the choice is attributable to the state and because the terms of the policy influence the choice as well. Furthermore, given the pervasive state involvement in public school graduation, abstaining from censorship is not enough to sever the state's association with speech made at the ceremony. To effectively disconnect itself from that speech, the state must be able to articulate secular, neutral criteria for selecting the speaker that are not related to the content of the speech.

This is the rule suggested by the Ninth Circuit's decision in *Doe v. Madison Sch. Dist. No. 321,* 147 F.3d 832 (9th Cir.1998), *vacated as moot,* 177 F.3d 789 (9th Cir.1999) (en banc). The majority finds the Duval County policy similar to the policy in *Doe,* but it is the differences that are instructive. Under the policy at issue in *Doe,* a minimum of four student speakers were selected strictly on the basis of their academic standing to deliver any sort of address they wanted.[5] *See id.* at 835. There was no opportunity to influence the types of speeches given, because there was no discretion in choosing the speakers. The authorities could also disconnect themselves from the content of the student speakers' speech because the speakers were chosen not for the views their peers or teachers hoped they would espouse, but on the basis

---

[4]Certainly some students will vote based on criteria such as the popularity of the candidates. We cannot assume, however, that this will be the norm. It is worth noting that the Duval County policy imposes no limits on campaigning.

[5]The policy in *Doe* did not limit the duration of the students' speech nor restrict it to a segment of the graduation program uniquely appropriate for, and traditionally devoted to, prayer. *See id.* at 834. Unlike the Duval County policy, nothing about the policy in *Doe* encouraged the student speakers to choose to deliver a prayer. If anything, requiring a minimum of four speakers minimizes the risk that the school administration promotes any particular type of message through the policy.

40

of a non-content based objective criterion (class standing) related to the graduation ceremony's purpose of celebrating student achievement.

Although the Duval County policy does not mandate that a prayer be offered at every graduation, it nonetheless keeps the state heavily involved in the choices regarding the ceremonies' opening and closing. The policy not only allows, but in some ways encourages, the choice of prayer. Although subtler and more indirect than the practice at issue in *Lee,* the Duval County policy contains the same elements of state involvement with religious expression.

*2.      Coerced Participation in a Religious Exercise*

The second dominant fact in *Lee* was that the state in effect compelled the graduating students' participation in a religious exercise. *See* 505 U.S. at 586, 112 S.Ct. at 2655. Coerced participation in a religious exercise is a separate and distinct issue from that of who controls the religious exercise. According to the Supreme Court, this coerced participation in prayer represents the injury suffered by dissenting students. *See Lee,* 505 U.S. at 594, 112 S.Ct. at 2659.

Writing about this second dominant fact, the *Lee* Court stated: "The sole question presented is whether a religious exercise may be conducted at a graduation ceremony where, as we have found, young graduates who object are induced to conform." *Id.* at 599, 112 S.Ct. at 2661. The majority here refuses to address that question. Instead, it holds that whether the school administration coerces student participation in a religious exercise "is largely determined by the measure of state control over the message at a graduation ceremony, rather than state control over the ceremony itself." The majority cites no authority for this interpretation, which essentially reads the "second dominant fact" out of *Lee* and disregards much of that decision's analysis.[6]

---

[6]The Supreme Court did not state in *Lee* whether either one of the "dominant facts" would constitute a violation of the Establishment Clause by itself, or whether the government needs to both direct a religious exercise and coerce participation in that religious practice. By deciding that coerced participation only exists if the government controls the religious exercise, the majority in this case answers the question, but in quick fashion. We need not address the relationship between the two dominant facts, because we conclude that both are present in the Duval County policy. It is worth reiterating, however, that the Supreme Court identified

41

The majority's interpretation also ignores the relationship between the Free Exercise and Establishment Clauses of the First Amendment. "The Free Exercise Clause embraces a freedom of conscience and worship," and the Establishment Clause is "[t]he method for protecting [that] freedom of worship and freedom of conscience in religious matters." *Id.* at 591, 112 S.Ct. at 2657. When the government requires an individual to participate in a religious exercise, it impinges that individual's freedom of conscience and worship, even if the government is not conducting the religious service itself.

Three factors contributed to the coercion of student participation in prayer in *Lee.* First, attendance for seniors is in effect mandatory because graduation is a significant right of passage in our society. *See id.* at 595, 112 S.Ct. at 2659. Second, "[a]t a high school graduation, teachers and principals must and do retain a high degree of control over the precise contents of the program, the speeches, the timing, the movements, the dress, and the decorum of the students." *Id.* at 597, 112 S.Ct. at 2660. Finally, adolescents are susceptible to peer pressure, and the pressure to conform "is strongest in matters of social convention." *Id.* at 593, 112 S.Ct. at 2659.

These coercive elements are as present at Duval County graduation ceremonies under the policy at issue in this case as they were at the Providence, Rhode Island, graduation scrutinized in *Lee.* Graduation is a central life event for teenagers in north Florida. School authorities set the dress code and prescribe appropriate behavior for seniors. Often, students are required to remain silent or even stand for the ceremonies' opening and closing messages. The Duval County policy exacerbates peer pressure, because would-be dissenters know that the majority of their classmates chose the student speaker. Finally, the policy heightens the social pressure to participate by allowing religious expression at a formal, ceremonial stage of the graduation. The audience remains seated and passive through much of the graduation, including speeches

the injury to the student plaintiffs as the mandatory participation in a religious exercise, without making reference to who conducted or controlled it. *See Lee,* 505 U.S. at 594, 112 S.Ct. at 2659.

by the valedictorian and invited dignitaries, but the opening and closing call for participation of some sort.[7]

According to *Lee,* even an understated gesture such as standing or remaining respectfully silent is a constitutionally significant degree of participation. *See id.* at 593, 112 S.Ct. at 2658. Students cannot be expected to express dissent in this environment, with the obligation of polite participation and the school authorities' control over student decorum.

B.       *The Lemon Test*

*Lee* is an obvious point of departure for evaluating the Graduation Policy because it is the most factually similar Supreme Court case, but it did not establish a new test for the Establishment Clause, and the Supreme Court did not state that the facts of *Lee* represent the boundary between what is and what is not constitutional. *Lemon* still provides the framework for evaluating a statute or policy's compliance with the Establishment Clause; it is the heart of the analysis.

*Lemon* requires that: (1) the Duval County school system have a secular purpose for adopting the policy; (2) the policy's primary effect neither advances nor inhibits religion; and (3) the policy does not result in excessive government entanglement with religion. *See Lemon v. Kurtzman,* 403 U.S. 602, 612-13, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971). The Duval County policy would violate the Establishment Clause if it fails to meet even one of these criteria, *see Edwards v. Aguillard,* 482 U.S. 578, 585, 107 S.Ct. 2573, 2577, 96 L.Ed.2d 510 (1987), but it falls short on two grounds: the policy has no genuine secular purpose, and its primary effect is to advance religion.

1.       *The Purpose of the Duval County Policy is Pre-Eminently Religious*

Applying the first prong of the *Lemon* test, we determine whether the challenged policy has a "clearly secular purpose" or "whether [the] government's actual purpose is to endorse or disapprove of religion."

---

[7]Duval County graduations bear out this observation. School officials typically ask the audience to stand for the first few segments of the ceremony, including the "Invocation" or "Inspiration" and there often is a song calling for more substantial participation. The audience then sits for the main body of the ceremony, which includes speeches and the presentation of diplomas. *See* R2 (Memorandum of Law in Support of Plaintiffs' Motion for Preliminary Injunction, Exs. 4-7, 8-19, 22, 25-28, 32-33, 37-40, 42-45).

*Wallace v. Jaffree,* 472 U.S. 38, 56, 105 S.Ct. 2479, 2489, 86 L.Ed.2d 29 (1985). We must be deferential to the government's articulation of the purpose behind a policy, and that policy need not be exclusively or even predominantly secular. *See Edwards,* 482 U.S. at 586-87, 107 S.Ct. at 2579; *Wallace,* 472 U.S. at 56, 105 S.Ct. at 2489. We must not, however, shirk our responsibility of judicial review. If a policy's "pre-eminent purpose" is religious, or if the proffered secular justifications for the policy are insincere, then the policy violates the Establishment Clause. *See Edwards,* 482 U.S. at 586-87, 107 S.Ct. at 2579; *Lynch v. Donnelly,* 465 U.S. 668, 690-91, 104 S.Ct. 1355, 1368-69, 79 L.Ed.2d 604 (1984) (O'Connor, J., concurring); *Stone v. Graham,* 449 U.S. 39, 41, 101 S.Ct. 192, 193-94, 66 L.Ed.2d 199 (1980); *Church of Scientology Flag Serv. Org. v. City of Clearwater,* 2 F.3d 1514, 1527 (11th Cir.1993). This is the case with the Duval County policy. The dominant reason for its passage was to keep prayer in graduation ceremonies; the secular justifications embraced by the majority are at best incidental effects of the policy.

The context surrounding the creation of the policy, the policy's terms, and the policy's title all suggest its predominantly religious purpose. The chronology of events leading up to the graduation policy is particularly telling. Until 1992 Duval County consistently opened and closed its schools' graduation ceremonies with prayer. Responding to the *Lee* decision in 1992, the school administration directed that future graduations could not include prayer. The administration then came under pressure from students and the community to find a way to retain prayer in the ceremonies. Before the next school year's graduation ceremonies, the administration created a new policy. That policy delegated decisions about the graduation ceremonies' opening and closing to students while lifting the restriction on religious expression. Finding a predominantly religious purpose behind the new policy in this context requires no speculation but only common sense.

Aspects of the new policy itself betray the purpose of maximizing the chance that prayer would be included in future graduation ceremonies without directly mimicking the school officials' actions proscribed by *Lee.* The policy only involves the opening and closing segments of the graduation ceremonies-the portions

44

of the program historically dedicated to prayer. The policy also carefully restricts opening and closing messages to two minutes, a short period amenable to a limited range of speech that includes prayer. Finally, the policy dictates that decisions about the two minute opening and closing be made by majoritarian vote, limiting the opportunity for innovation and variety.

Finally, there is the title of the memorandum announcing the new policy: Graduation Prayer. The attorney who drafted the memorandum obviously understood the reason for the policy, but the majority of this court chooses to ignore the evidence. Instead, it relies on the maxim that it is improper to use a statute's title to inform the plain meaning of the statute's language. In all the cases cited by the majority, however, the courts had to interpret the meaning of statutes in order to apply them correctly.[8] In this case, on the other hand, the question is why the school administration created the policy.

Moreover, "Graduation Prayer" is not simply the name of a bill or a title chosen during the codification process: it is title of the memorandum announcing and explaining the new policy to the principals who would have to administer it. The Graduation Prayer memorandum was written at the behest of the school Superintendent by the attorney who crafted the policy.[9] Certainly the title and text of the memorandum could provide insight into the policy's instrumental goals.

The memorandum begins with two paragraphs devoted to prayers at graduation and the discord following *Lee.* This analysis concludes with an explanation of the "key to the *Lee v. Wiseman* [sic] decision," and then, "[w]ith that premise in mind," segues into the provisions of the new policy. The policy's operational terms carefully avoid mention of prayer, but the memorandum as a whole makes clear that the choice of a title was far from incongruous.

---

[8]*See Brotherhood of R.R. Trainmen v. Baltimore & Ohio R.R. Co.,* 331 U.S. 519, 525-26, 67 S.Ct. 1387, 1390-91, 91 L.Ed. 1646 (1947); *North Ala. Express, Inc. v. Interstate Commerce Comm'n,* 971 F.2d 661, 663-64 (11th Cir.1992); *Scarborough v. Office of Personnel Management,* 723 F.2d 801, 811-16 (11th Cir.1984); *Rich v. Commissioner of Internal Revenue Serv.,* 250 F.2d 170, 173-75 (5th Cir.1957).

[9]In sharp contrast, numerous legislators influence the choice of statutory language, and titles are often chosen for political effect rather than to accurately summarize a bill's purpose or content.

45

The majority makes much of the "plain" and "facially neutral" language of the policy itself. Adopting the terminology "opening or closing message" in the wake of *Lee,* however, appears as subterfuge, a "sham," *see Edwards,* 482 U.S. at 587, 107 S.Ct. at 2579, given the tradition of beginning and ending graduation with prayer. In the words of Shakespeare: "What's in a name? That which we call a rose / By any other name would smell as sweet."[10]

Unconvinced, the majority suggests three possible secular purposes for the policy: First, that the policy "afford[s] graduating students an opportunity to direct their own graduation ceremony;" second, that it permits free expression; and finally that the policy "allows students to solemnize graduation." None of these possibilities withstands close scrutiny.

It is hard to accept that the Duval County school administration crafted the policy to empower students, both because the policy does so in such a constrained manner and because there is scant evidence that the administration was interested in promoting student leadership or autonomy as ends in themselves. The policy does conclude with the statement, "[t]he purpose of these guidelines is to allow students to direct their own graduation message without monitoring or review by school officials," but the majority places more significance on the statement than it can bear.[11] The statement expresses the "purpose" of the policy in terms of what it does, rather than why it was created. And as mentioned above, the memorandum begins with two paragraphs about school prayer and instructs the reader to consider the terms of the policy with that discussion in mind. The sentence about student direction, without any accompanying elaboration, appears "tacked on" to the end of the memorandum.

---

[10]William Shakespeare, *Romeo and Juliet,* act 2, sc. 2.

[11]The Supreme Court looked beyond a similarly "self-serving" statement of purpose in a Kentucky statute in *Stone,* 449 U.S. at 41, 101 S.Ct. at 193-94. The statute required that the Ten Commandments be posted in each classroom and noted the " 'secular application of the Ten Commandments' " in their " 'adoption as the fundamental legal code of Western Civilization and the Common Law of the United States.' " *Id.* at 41, 101 S.Ct. at 193 (quoting Ky.Rev.Stat. Ann. § 158.178 (Banks Baldwin 1980)). Despite the elucidation of a legitimate educational rationale in the statute, the Court held that "[t]he pre-eminent purpose for posting the Ten Commandments on schoolroom walls is plainly religious in nature." *Id.* at 41, 101 S.Ct. at 194.

This secular purpose inserted in the text might still be credible if there were any other indication that the administration had been considering the benefits of expanded student speech and self-governance before the intense interest in graduation prayer arose following *Lee.* Although the record is replete with evidence that students and community members pressed school officials to retain prayer in the graduation ceremonies, however, there is no evidence that officials were promoting, or that students were demanding, a larger role planning the graduation program and more student speech generally.[12]

Finally, the Duval County policy enhances student control over the graduation ceremony in only the most limited sense. The senior class cannot choose to have a group deliver a message, and it cannot select a non-student speaker. The speaker's options are limited, because the policy restricts the message to two minutes at the beginning or end of the ceremony. Interestingly, the policy does not ensure that other student presentations during the graduation will be uncensored. In fact, principals often review valedictory speeches in Duval County.[13] Although the school administration can promote student expression incrementally, the graduation policy's stringent constraints and the choice to relinquish to students only the planning for the opening and closing suggest that student autonomy and free expression were not the policy's true purposes.

The majority also suggests that solemnizing graduation ceremonies may have been the purpose behind the Duval County policy, but the policy actually reduces the potential for solemnization. Until the policy went into effect, an opening and closing prayer at every graduation ceremony served a solemnizing function. Now, however, the opening and closing are optional, and for each graduation, students have to choose anew whether to even have a message. Moreover, the majority is quick to emphasize that the policy leaves the content of the opening and closing messages, should the senior class decide to have them,

---

[12]I do not mean to suggest that the school administration was hostile to student involvement in planning graduation ceremonies. Historically the student role in planning graduation varied from school to school. Student leadership was quite strong at some schools, but school officials always had ultimate authority over the graduation program. There simply is no evidence that interest in, or pressure for, student autonomy was on the rise in 1992 and 1993.

[13]*See* R 1st Supp. Exs. (Reynolds Dep. at 21; Epting Dep. at 26-27; Lockett Dep. at 11).

unfettered. If the choice of messages is as wide-ranging as the majority would have us believe, however, many of the possibilities would serve no solemnizing function.[14] With its new policy, Duval County moved from having a solemnizing opening and closing message at every graduation ceremony to the possibility of having, if not a prayer, either no message or a message that undermines the solemnity of the occasion.

Moreover, solemnization is not a valid purpose for a policy purportedly giving students unfettered control over the content of a speech. As already noted, prayer is one of a limited subset of messages with a solemnizing effect. To the extent the school administration wanted and expected students to opt for solemnizing messages, it is likely the administration had prayer in mind. This is an illegitimate purpose under *Lemon;* public officials cannot encourage prayer, because even if prayer has secondary secular benefits, the promotion of prayer is first and foremost the promotion of religion. *See ACLU of N.J. v. Black Horse Pike Reg'l Bd. of Educ.,* 84 F.3d 1471, 1485 (3d Cir.1996); *Harris v. Joint Sch. Dist. No. 241,* 41 F.3d 447, 458 (9th Cir.1994), *vacated with directions to dismiss as moot,* 515 U.S. 1154, 115 S.Ct. 2604, 132 L.Ed.2d 849 (1995); *Jager v. Douglas County Sch. Dist.,* 862 F.2d 824, 829-30 (11th Cir.1989).

Finally, by the majority's own logic, solemnization should not be considered as a possible purpose for the graduation policy. The majority chides Appellants for looking beyond the text of the Graduation Prayer memorandum, but solemnization appears nowhere in the policy's terms or the memorandum's prefatory

---

[14]Uninfluenced by the terms of the policy or the expectations of their teachers and colleagues, student speakers could take the opportunity to criticize the principal, teachers, or cliquish classmates. Even an innocent but unfocused or poorly delivered speech would not solemnize the event. A proselytizing prayer would prove divisive rather than solemnizing as well. *See Doe v. Santa Fe Indep. Sch. Dist.,* 168 F.3d 806, 816 (5th Cir.1999), *cert. granted in part,* --- U.S. ----, 120 S.Ct. 494, 145 L.Ed.2d 381 (1999) ("[W]e cannot fathom how permitting students to deliver sectarian and proselytizing prayers can possibly be interpreted as furthering a solemnizing effect."). The majority cites three cases for the proposition that prayer can serve a legitimate solemnizing function, but all three recognized that they were considering only non-sectarian, non-proselytizing speech. *See Chaudhuri v. Tennessee,* 130 F.3d 232, 236-37 (6th Cir.1997), *cert. denied,* 523 U.S. 1024, 118 S.Ct. 1308, 140 L.Ed.2d 473 (1998); *Tanford v. Brand,* 104 F.3d 982, 983, 986 (7th Cir.1997); *Jones,* 977 F.2d at 964-66. The majority also cites Justice O'Connor's concurrence in *Lynch* for the more general proposition that religious expression can solemnize public occasions, but Justice O'Connor's statement is qualified. "[G]overnment acknowledgments of religion," she writes, can "serve ... the legitimate secular purpose[ ] of solemnizing public occasions," but her examples are all practices that "are not understood as conveying government approval of particular religious beliefs." *Lynch,* 465 U.S. at 693, 104 S.Ct. at 1369-70.

48

paragraphs. Hypothetical justifications for a state law or action are not enough to satisfy the *Lemon* test; courts must look for the *actual* purpose. *See Wallace,* 472 U.S. at 56, 105 S.Ct. at 2489. In this case, that search leads only to the promotion of religion.

*2.      The Primary Effect of the Duval County Policy is to Advance Religion*

A governmental policy fails the second prong of the *Lemon* analysis if it has the primary effect of endorsing religion. *See County of Allegheny v. ACLU Greater Pittsburgh Chapter,* 492 U.S. 573, 592-94, 109 S.Ct. 3086, 3100-01, 106 L.Ed.2d 472 (1989). Endorsement occurs if a reasonable observer would believe the policy conveys a message favoring (or disfavoring) religion. *See id.,* 492 U.S. at 597, 109 S.Ct. at 3103 (Blackmun & Stevens, JJ.); *id.* at 691-92, 109 S.Ct. at 3121 (O'Connor, Brennan, & Stevens, JJ., concurring); *School Dist. of Grand Rapids v. Ball,* 473 U.S. 373, 390, 105 S.Ct. 3216, 3226, 87 L.Ed.2d 267 (1985), *amended on other grounds, Agostini v. Felton,* 521 U.S. 203, 236, 117 S.Ct. 1997, 2016, 138 L.Ed.2d 391 (1997); *Lynch,* 465 U.S. at 691-92, 104 S.Ct. at 1369 (O'Connor, J., concurring). Such a conclusion is possible either if a policy tangibly benefits a religious cause more than any other, or if the observer would believe that a desire to promote religion led to the policy.

The majority discounts the possibility that a facially neutral policy could have the primary effect of advancing religion. One must look beyond the text of a policy, however, to determine its likely effects. The analysis "requires courts to examine the history, language, and administration of a particular statute to determine whether it operates as an endorsement of religion." *Wallace,* 472 U.S. at 74, 105 S.Ct. at 2499 (O'Connor, J., concurring in the judgment); *see also Allegheny,* 492 U.S. at 629, 109 S.Ct. at 3120 (O'Connor, Brennan, & Stevens, JJ., concurring in part and concurring in the judgment). This analysis reveals that both the policy itself, viewed in terms of the events leading up to its creation, and the prayers that result from it convey a message of religious endorsement.

Seen in context, the Duval County policy betrays a preference for religious expression despite the seeming neutrality of its terms. It is worth repeating a few details from the analysis of the policy's purpose.

The chronology of events leading to the policy and the public pressure to keep prayer as part of the high school graduation ceremonies may not be conclusive evidence, but they inform the reasonable observer's understanding of the policy's purpose. The title of the policy itself, the bulk of the memorandum announcing it, and the fact that the policy only applies to the portion of the graduation ceremony traditionally reserved for prayer are even more telling. Together, these details have the effect of communicating to the reasonable observer that the Duval County authorities favored the inclusion of prayer in future graduation ceremonies.

The interpretation of the school principals reinforces this conclusion. The principals were the first recipients of the Graduation Prayer memorandum, the policy's first "reasonable observers." The principals were responsible for implementing the new policy; how they did so reveals their understanding of its meaning and purpose. In 1993 many principals allowed direct votes on whether to have a prayer during the graduation ceremony.[15] In other schools, officials directly asked the senior class chaplain to deliver a message during graduation.[16] Since 1993 it has been common for the official graduation programs to list the student speaker as Chaplain, and to use the religious terms "invocation" and "benediction" instead of "opening" and "closing message."[17] These programs are printed before the graduation ceremony without the benefit of reviewing the student's speech.

Beyond an observer's conclusions about the school administration's motives lies the policy's tangible result: it leads to more prayer at public events. Before the policy took effect, the Superintendent had responded to *Lee* by proscribing the traditional opening and closing graduation prayers. The new policy provided a mechanism to reestablish prayer in those portions of the ceremony. In the policy's first year, ten out of seventeen schools opted for some sort of prayer, meaning that it led to more prayer than all other forms

---

[15]*See* R 1st Supp. Exs. (Stone Dep. at 16; Johnson Dep. at 8; Hite Dep. at 18-19).

[16]*See* R 1st Supp. Exs. (Lockett Dep. at 11; Paulk Dep. at 20).

[17]Plaintiffs submitted copies of 45 graduation programs to the district court. Almost all use the terms "invocation" and "benediction," and most list the student speaker as the class chaplain. *See* R2 (Memorandum of Law in Support of Plaintiffs' Motion for Preliminary Injunction, Exs. 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 22, 25, 26, 27, 28, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 43, 44, 45).

of speech combined. And the inherent effect of prayer is to advance the religious beliefs of the speaker.[18]

*See Black Horse Pike,* 84 F.3d at 1487; *Harris,* 41 F.3d at 458. The fact that prayers delivered as a result of the policy occur at a stage of the graduation ceremony carrying the strongest imprint of the state further exacerbates this impermissible effect.

*C.      The Public Forum Doctrine*

Without deciding whether Duval County graduation ceremonies are public fora, the majority suggests that the public forum doctrine supports the constitutionality of the policy at issue in this case. I reject the analogy. According to the majority, the government does not control a private speaker's speech in a public forum, and private speech cannot convey a message of state endorsement. This may be an accurate statement

---

[18]The majority argues that the student speaker's speech is private, and thus cannot violate *Lemon* 's second prong. I believe the opening and closing messages can be attributed to the State, but the disagreement is not dispositive here. The Fifth Circuit addressed this point cogently in *Santa Fe,* holding that, "The mere fact that prayers are student-led or student-initiated, or both, does not automatically ensure that the prayers do not transgress *Lemon* 's second prong.... [W]hen the school 'permits' sectarian and proselytizing prayers ... such 'permission' undoubtedly conveys a message not only that the government endorses religion, but that it endorses a particular form of religion." 168 F.3d at 817-18. In a different context, the Seventh Circuit has also held that private speech can violate *Lemon* 's primary effects prong if private expression is associated with a government-controlled forum. *See Freedom From Religion Found. v. City of Marshfield,* 203 F.3d 487 (7th Cir.2000) (statue of Jesus on private land deemed part of surrounding public park for Establishment Clause purposes). The next section, focusing on the public forum doctrine, discusses this issue more thoroughly.

> In support of its conclusion, the majority cites a number of Supreme Court cases for the proposition that "facially neutral programs [permitting] individuals to support religion through their own private choices" are constitutional. Those cases all involve the extension of a public benefit to families with children in private schools—factual scenarios very different from Duval's graduation policy. Moreover, the programs at issue in those cases were constitutional because they did not influence families' choice to send their children to religious schools. *See Agostini v. Felton,* 521 U.S. 203, 230-32, 117 S.Ct. 1997, 2014, 138 L.Ed.2d 391 (1997); *Witters v. Washington Dep't of Servs. for the Blind,* 474 U.S. 481, 488, 106 S.Ct. 748, 752, 88 L.Ed.2d 846 (1986); *Mueller v. Allen,* 463 U.S. 388, 398-99, 103 S.Ct. 3062, 3068-69, 77 L.Ed.2d 721 (1983). This was because the programs distributed their benefits neutrally and comprehensively. A related point is that every family was able to make its own choice about its children's schooling under the government programs. Both of these attributes are missing in our case. The constraints of the Duval County policy influence the decisions about the graduation message, pushing students to opt for prayer. Furthermore, there is only one graduation ceremony. "Each student is not allowed to have the graduation she wants. Instead, the decision is made by a majority of the senior class and imposed on a minority." *Harris,* 41 F.3d at 456.

of the law,[19] but it is of little use in this case, because Duval County's graduation ceremonies have none of the public forum's characteristics. In *Lee v. Weisman,* the Supreme Court noted that school authorities maintain close control over the program and speeches at graduation ceremonies.[20] 505 U.S. 577, 597, 112 S.Ct. 2649, 2660, 120 L.Ed.2d 467 (1992). This assumption is understandable, because graduation ceremonies have never been considered public fora. *See ACLU of N.J. v. Black Horse Pike Reg'l Bd. of Educ.,* 84 F.3d 1471, 1478 (3d Cir.1996); *Jones v. Clear Creek Indep. Sch. Dist.,* 930 F.2d 416, 418 (5th Cir.1991), *vacated on other grounds,* 505 U.S. 1215, 112 S.Ct. 3020, 120 L.Ed.2d 892 (1992); *Doe v. Madison Sch. Dist. No. 321,* 147 F.3d 832, 838 (9th Cir.1998), *vacated as moot,* 177 F.3d 789 (9th Cir.1999) (en banc).

Public fora are places permitting broad access for the expression of diverse views. *See Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.,* 473 U.S. 788, 802, 105 S.Ct. 3439, 3449, 87 L.Ed.2d 567 (1985); *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 45, 103 S.Ct. 948, 954-55, 74 L.Ed.2d 794 (1983). *See, e.g., Capitol Square Review & Advisory Bd. v. Pinette,* 515 U.S. 753, 757-58, 115 S.Ct. 2440, 2444, 132 L.Ed.2d 650 (1995). The "marketplace of ideas" governs in public fora, which serve an important

---

[19]In fact, five Justices have demonstrated an openness to the possibility that private speech in a public forum could violate the Establishment Clause. *See Capitol Square Review & Advisory Bd. v. Pinette,* 515 U.S. 753, 772, 115 S.Ct. 2440, 2451, 132 L.Ed.2d 650 (1995) (O'Connor, Souter, & Breyer, JJ., concurring in result); *id.* at 807, 115 S.Ct. at 2469. (Stevens, J., dissenting); *id.* at 817-18, 115 S.Ct. at 2474-75 (Ginsburg, J., dissenting). Only a plurality of the Court, in an opinion written by Justice Scalia, took the opposite view. *See id.* at 770, 115 S.Ct. at 2450. Even the Scalia plurality acknowledged that the government could unconstitutionally manipulate an ostensibly public forum to favor religious speech. *See id.* at 766, 115 S.Ct. at 2449.

The Seventh Circuit reached this same conclusion, determining that a majority of Justices had rejected a "per se" approach to Establishment Clause claims involving private speech in a public forum. *See Freedom From Religion Found.* The Seventh Circuit went on to hold that a city's sale of land with a religious statue violated the Establishment Clause even under the Scalia plurality's approach because it in effect granted preferential access to a public forum—the park surrounding the statue. *See id.* at ----.

[20]In Duval County for example, school officials often review the valedictorian's speech, and they plan or approve the entire graduation program. *See* R 1st Supp. Exs. (Reynolds Dep. at 21; Epting Dep. at 26-27; Lockett Dep. at 11) (review of valedictory speeches); *id.* (Epting Dep. at 28-29; Reynolds Dep. at 39; Stone Dep. at 9-10). The graduation policy allows these practices to continue.

role both in facilitating the exchange of viewpoints and in providing a safe venue for new and marginalized ideas.

Duval County certainly did not create a public forum by allowing a single student to deliver an uncensored opening or closing message. An essential characteristic of public fora is that they permit extensive public participation, or at least general access to the relevant class of potential speakers. *See Arkansas Educ. Television Comm'n v. Forbes,* 523 U.S. 666, 118 S.Ct. 1633, 1641-43, 140 L.Ed.2d 875 (1998); *Cornelius,* 473 U.S. at 802-04, 105 S.Ct. at 3449-50; *Perry Educ. Ass'n,* 460 U.S. at 47, 103 S.Ct. at 956; *Greer v. Spock,* 424 U.S. 828, 838 n. 10, 96 S.Ct. 1211, 1217 n. 10, 47 L.Ed.2d 505 (1976). The majority cites a number of cases permitting religious groups to use school facilities or funds, or public parks, but their holdings depended on the fact that use of the fora by a "broad spectrum" of groups eliminated any potential message of endorsement or preference for religion.[21] *See Rosenberger v. Rector & Visitors of the Univ. of Va.,* 515 U.S. 819, 839-42, 115 S.Ct. 2510, 2521-23, 132 L.Ed.2d 700 (1995); *Capitol Square,* 515 U.S. at 762-63, 115 S.Ct. at 2447; *Board of Educ. of Westside Community Schools v. Mergens,* 496 U.S. 226, 252, 110 S.Ct. 2356, 2373, 110 L.Ed.2d 191 (1990) (O'Connor, J., plurality opinion); *Widmar v. Vincent,* 454 U.S. 263, 274, 102 S.Ct. 269, 277, 70 L.Ed.2d 440 (1981).

Duval County, however, has implemented no "open microphone" policy at its graduation ceremonies. The graduation policy permits only one speaker at the opening and closing, so there can be no diversity of views communicated in the messages. Selecting speakers through a majority vote also runs counter to the notion of "general access" necessary for a public forum and limits the possibility that the resulting speech will

---

[21]Furthermore, none involved speech at a government-sponsored and controlled event. The possibility that someone will conclude that the state is endorsing the content of a speech is much lower when the government allows an organization to use a classroom after school hours than when the government organizes a presentation and invites an audience. Certainly students could organize a private prayer meeting on school grounds before the official graduation ceremony, but that is not the issue here.

offer a fresh perspective to the audience. When the student speaker delivers the opening or closing message at a Duval County graduation, she is largely preaching to the converted.[22]

D.      *Appellants' As-Applied Claims*

During the hearing for a preliminary injunction, the district court raised the possibility of advancing the trial on the merits pursuant to Federal Rule of Civil Procedure 65(a)(2).[23] In an order dated the same day, the court did so, consolidating the trial on the merits with the preliminary injunction hearing and entering final judgment for the Duval County School Board. The majority claims Appellants waived their as-applied claims by consenting to the consolidation. This interpretation of Rule 65(a)(2), however, is without support in the case law or the record from the district court.

If a party consents to a Rule 65(a)(2) consolidation, it cannot later complain about the consequences-the limited time to prepare and the curtailed opportunity for discovery. *See Fenstermacher v. Philadelphia Nat'l Bank,* 493 F.2d 333, 337 (3d Cir.1974). But the majority cites no case for the proposition that advancing the trial on the merits eliminates claims that would have benefitted from thorough discovery. Instead, a court enters final judgment on all claims after a Rule 65(a)(2) consolidation based on whatever limited evidence is before it at that time.

---

[22]It is true that in a public forum with open access and diverse expression, it would be difficult for the government to manipulate speech and there is little danger that an audience will believe the speech carries the government's imprimatur. This insight from public forum law, however, suggests a corollary that highlights the graduation policy's problems: at a non-public forum that is highly regulated by the government, there is both an elevated danger of government control over speech and a significant risk that the audience will associate the speech with the government.

[23]Federal Rule of Civil Procedure 65(a)(2) provides:

> (2) *Consolidation of Hearing With Trial on Merits.* Before or after the commencement of the hearing of an application for a preliminary injunction, the court may order the trial of the action on the merits to be advanced and consolidated with the hearing of the application [for a preliminary injunction]. Even when this consolidation is not ordered, any evidence received upon an application for a preliminary injunction which would be admissible upon the trial on the merits becomes part of the record on the trial and need not be repeated upon the trial. This subdivision (a)(2) shall be so construed and applied as to save to the parties any right they may have to trial by jury.

Nothing in the district court order advancing the trial on the merits or in transcript of the preliminary injunction hearing suggests that the judge or the parties intended otherwise. No one disputes that in their complaint the Appellants pleaded facts pertaining to graduation ceremonies between 1993 and 1997 and included an as-applied claim.[24] Immediately after broaching the possibility of a Rule 65(a)(2) consolidation at the preliminary injunction hearing, the district judge acknowledged that Appellants had a claim for damages.[25] At no time during the hearing did the judge suggest he was dismissing the as-applied claims as waived.

In its order advancing the trial on the merits, the district court directed the Clerk to enter final judgment for the Defendants without distinguishing between the facial and as-applied claims.[26] The order made scant reference to the facts of the case, and the assertion in the order that Appellants' counsel "stipulated that the operative facts remain[ed] unchanged"[27] since 1994 is unsupported by the record. In fact, during the preliminary injunction hearing the Appellants' counsel made substantial reference to the evidentiary exhibits

---

[24]*See* R1, Tab 1 (Verified Complaint WW 24, 30, & at p. 14) (making factual allegations about graduation ceremonies between 1993 and 1997, raising an as-applied Establishment Clause claim, and praying for damages on behalf of students who graduated after 1993).

[25]The dialogue went as follows:

> THE COURT: All right. The next question is why shouldn't I, under Rule 65(a)(2) of the Federal Rules of Civil Procedure, order that the consideration of this case on its merits be advanced to this stage procedurally and decide the case and send it on to the Court of Appeals?
>
> MR. SHEPPARD: I think the Court certainly has that discretion. I think that it may be—well, I've said what I said.
>
> THE COURT: Well, you have a damage claim. I understand that.
>
> MR. SHEPPARD: Yes, sir. We would want to take some discovery with regard to that, would be my view.

*See* R1, Tab 30, at 29 (Transcript of Hearing on Plaintiffs' Motion for Preliminary Injunction).

[26]R1, Tab 27 at 3-4.

[27]*Id.* at 2.

already filed with the court and expressed the need for further discovery.[28] The order focused on whether the law had changed since 1994, when the same district judge upheld the constitutionality of the graduation policy in an earlier lawsuit, *see Adler v. Duval County Sch. Bd.,* 851 F.Supp. 446 (M.D.Fla.1994), and the court concluded that it had not. Given its interpretation of Establishment Clause and Free Speech jurisprudence, the details of the graduation ceremonies in Duval County seemed unimportant.

Appellants did not waive their as-applied challenge to the graduation policy; the district court entered judgment for the Appellees on that claim. This may or may not have been the correct disposition, because the district court did not have a thorough record of the policy's application.

There is a difference between having a thin record, however, and having no evidence at all. Appellants filed dozens of graduation programs from the years 1994-1998 and the affidavit of Karen Adler in support of their motion for a preliminary injunction in this case,[29] and the district court also took judicial notice of the record from the earlier case concerning the Duval County policy.[30] The record includes the transcript of sectarian prayers delivered at graduation ceremonies as well as official programs that contained printed prayers, referred to the "student message" as an "invocation," and indicated that ministers have continued to deliver prayers at some Duval County graduations long after *Lee.*[31] In fact, Appellants maintain that, although they would welcome the opportunity for more discovery, the record supports a reversal in their favor on all claims.

---

[28]*See* R1, Tab 30, at 14-16, 29 (Transcript of Hearing on Plaintiffs' Motion for Preliminary Injunction).

[29]*See* R2 (Memorandum of Law in Support of Plaintiffs' Motion for Preliminary Injunction, with 58 exhibits); R1, Tab 12 (Adler Aff.).

[30]R1, Tab 26 (Order on Various Motions).

[31]*See* R2 (Memorandum of Law in Support of Plaintiffs' Motion for Preliminary Injunction, Exs. 4, 5, & 13 (religious expression printed in official program)); 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 22, 25, 26, 27, 28, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 43, 44, 45 (reference to "invocation," "benediction," or "chaplain" in the program); 30 (minister delivered prayer).

The procedural posture of this case is awkward at best. It is understandable that both the district court and this court would want to focus, without complications, on the important question of the graduation policy's facial constitutionality. It is not right, however, for the as-applied claim of Duval County students to disappear without a trace.

*Conclusion*

Duval County has not adopted a blanket approach of neutrality toward religion or eliminated school sponsorship and control over graduation ceremonies. Rather, the policy at issue in this case evinces a desire to maintain the graduation ceremony's traditional invocation and benediction in the wake of *Lee.* The policy does not explicitly mention religion and does not require any speech at all, but its terms nonetheless promote religious expression. To be more specific, the policy encourages the delivery of a prayer during a stage of the graduation ceremony when the content seems most "official" and when officials' control over audience participation is at its highest.

This violates the Constitution. The Establishment Clause bars the government from encouraging religious expression, either overtly or subtly, and from conveying a message, intentional or not, of endorsement for religious speech.[32] Moreover, the policy utilizes the vote to further its purpose, and in so doing corrupts the most cherished of democracy's tools. For the government cannot delegate the authority to do what it could not do itself, and constitutional rights are not subject to the whims of an electoral majority. For the foregoing reasons, I dissent from the majority's opinion.

---

[32]Nothing in this dissent suggests that all religious expression at a public high school graduation would run afoul of the Establishment Clause. Graduation ceremonies are state-sponsored events controlled by school officials, however, and to disconnect (rather than just distance) themselves from any religious views expressed by speakers, school officials must be able to articulate a neutral criterion for selecting speakers unrelated to the potentially religious content of their speech. This would ensure both that school officials do not use their influence over the graduation program to promote religious beliefs and that the audience does not view religious views expressed by speakers as state sanctioned. Thus, the valedictorian could thank God or share the role faith played in her life. Furthermore, religious expression that is not part of the graduation program raises no Establishment Clause concerns. Audience members could pray quietly in their seats, and students could organize a prayer service immediately before or after the graduation ceremony.

57